

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

---
### NO. WR-84,565-01
---

### EX PARTE KERRY MAX COOK, Applicant

---
### ON APPLICATION FOR WRIT OF HABEAS CORPUS
### CAUSE NO. 1-77-179-A IN THE 114TH JUDICIAL DISTRICT COURT
### FROM SMITH COUNTY
---

RICHARDSON J., delivered the opinion of the Court in which HERVEY, NEWELL, WALKER, SLAUGHTER, and MCCLURE, JJ., joined. KELLER, P.J., filed a concurring opinion. KEEL, J., concurred. YEARY, J., filed a dissenting opinion.

## OPINION

In perhaps one of the most notable murder cases of the last half-century, Applicant Kerry Max Cook applies for a writ of habeas corpus that his conviction be set aside under due process grounds and because he is actually innocent. Marked by bookends of deception spanning over 40 years, this case has traversed a winding odyssey through our justice system stretching back to 1977. It begins where the State failed to disclose and was not truthful to the defense, to the court, and to the jury about a favorable deal given to a

jailhouse snitch who was their star witness in the first trial.[1] The fact that the jailhouse snitch received favorable treatment was not revealed to Applicant until fourteen years after he testified.[2] Marking the other end of this 40-year odyssey, an alternate suspect admitted in a 2016 sworn deposition, under a grant of immunity, that he lied about the timing of his last sexual encounter with the victim. In doing so, the alternate suspect admitted to perjuring himself in front of multiple juries and at pretrial hearings. This case is riddled with allegations of State misconduct that warrant setting aside Applicant's conviction. And when it comes to solid support for actual innocence, this case contains it all— uncontroverted Brady violations, proof of false testimony, admissions of perjury, and new scientific evidence. Both parties now agree that the Applicant is entitled to have his conviction set aside. On actual innocence, however, the State inconsistently opposed Cook's claim in a stipulation agreement, and then indicated they were silent on the issue in a subsequent motions hearing.[3]

The victim, Linda Jo Edwards, deserves justice for her murder and for the unspeakable way it was committed. It is alarming that for more than four decades some of those charged with pursuing that justice for Linda have actually obstructed the search for

---

[1] We make clear here that we do not hold the current prosecutors for the State in any way responsible for the past events in this case.

[2] (8-25-2016 II of VII RR 49).

[3] Stipulation and Settlement Agreement on App. for Writ of Hab. Corp., at *5 (June 6, 2016); (2017-09-26 1 RR 1-11) ("Motion Hearing").

the truth of what really happened that night.[4] During the past 40 years, not only have memories faded because of the passage of time, witnesses have died and evidence in the care of the State has been inexplicably destroyed. Linda Jo Edwards deserves better. This legal odyssey includes three trials, multiple appeals and reversals before this Court and the U.S. Supreme Court, followed by a plea agreement of no contest on the verge of a fourth trial in 1999.  In light of new evidence and for the following reasons, we find Kerry Max Cook actually innocent, especially when viewed in context of all other evidence in the record.

Part I provides a basic factual overview of the case. Part II details the procedural background including each of the successive trials, their appeals to this Court and the United States Supreme Court, and the fourth and final prosecution which resulted in his conviction via a plea agreement.[5] The body of evidence's evolution at each successive

---

[4] It is derivative of the State's duty to "see justice done" that the State is obligated to pursue the truth to the best of its ability and present its evidence truthfully to the court. It violates our "fundamental conceptions of justice" and Due Process where the State "contrive[s] a conviction" through "a deliberate deception of court and jury." *Mooney v. Holohan*, 294 U.S. 103, 112 (1935). Thus, the State may not knowingly sponsor perjured testimony, "solicit[] false evidence, or allow it to go uncorrected when it appears." *Napue v. Illinois*, 360 U.S. 264, 269 (1959). Neither may the State deliberately conceal material witness testimony that creates or contributes to creating a reasonable doubt in the guilt of the accused. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). These deceptions "[are] as inconsistent with the rudimentary demands of justice as is the obtaining of a like result by intimidation." *Mooney*, 294 U.S. at 112. In the course of prosecuting this case, prior agents of the State violated or attempted to violate all of these.

[5] For clarity, the successive trials and their respective outcomes are listed below:

1979 Trial ("1st trial"):  Resulted in conviction; sentenced to death; but was ultimately reversed by this Court after the United States Supreme Court vacated this Court's earlier affirmation and remanded the case in light of *Satterwhite v. Texas*, 486 U.S. 249 (1988).  *Cook v. State,* 821 S.W.2d 600 (Tex. Crim. App. 1991).

3

prosecution and State misconduct discovered along the way will also be noted. Part III contains an overview of the new evidence revealed since Cook's fourth prosecution in 1999, Cook's current writ application, and the habeas court's findings, conclusions, and recommendations. Part IV analyzes Cook's claim of actual innocence by examining the numerous weaknesses in the totality of the State's evidence after combining the new evidence with existing evidence. This includes:

- Weaknesses in the State's timeline of events;

- The numerous inconsistencies with Paula Rudolph's eyewitness testimony by itself and its incompatibilities with other evidence;

- Cook's fingerprints on the sliding patio door, the State's deception regarding their age, and other exculpatory inconsistencies surrounding them;

- Problems with the State's crime classification and criminal profile generated from the crime scene as applied to Cook;

- The missing hair with a bloody root found stuck to the victim's buttocks;

- Inconsistencies in Bob Wickham's testimony of Cook's alleged confession; and

- Mayfield's semen DNA in the victim's underwear, Mayfield's 2016 deposition, and his knowledge of *The Sexual Criminal* by J. Paul de River and its context to the murder. (This includes his admissions of perjury over multiple trials spanning decades.)

This will be followed by a conclusion after a brief summary of the evidence.

---

1992 Trial ("2nd trial"): Resulted in mistrial after the jury could not reach a unanimous verdict. *Cook v. State*, 940 S.W.2d 623, 637 (Tex. Crim. App. 1996).

1993-94 Trial ("3rd trial"): Resulted in conviction; sentenced to death; but was reversed by this Court and remanded for retrial. *Cook v. State,* 940 S.W.2d 623 (Tex. Crim. App. 1996).

4

**Basic Factual Overview**

On the morning of June 10, 1977, Paula Rudolph discovered the body of her roommate, Linda Jo Edwards, on the floor of Linda's bedroom in their apartment (No. 169) in Tyler, Texas. Linda's body showed repeated blunt force trauma to her face and head, numerous stab wounds, and mutilation of her sexual organs and face. Bloody handprints, smears, and signs of skin-on-skin contact were also found on the body. While two of the murder weapons, a small plaster statue and a pair of scissors, were discovered in the room right away, the third murder weapon, a French carving knife, was not found until a week later by Paula's father in an adjoining closet. No identifiable fingerprints were found inside the apartment other than those belonging to Paula or Linda. But a set of fingerprints were found on the exterior of the patio sliding door that matched Kerry Max Cook, the applicant in this case. Investigators concluded that these fingerprints were positioned in a way that could have only meant that Cook was inside the apartment holding the sliding door when he made them. Nevertheless, there were no signs of blood on the fingerprints. Even though the State had evidence that Cook and Linda knew each other, Cook denied knowing or having had any contact with Linda.

Well before her death, Linda Jo Edwards was having a long-term affair with her supervisor, James Mayfield, then Dean of Learning Resources at Texas Eastern University in Tyler. At that time, Mayfield was married with three children and lived in a house near

5

the university campus. On May 14, 1977, James Mayfield left his wife, Elfriede, without any notice, and signed a lease contract with Linda at the Embarcadero Apartment complex—the same apartment complex where Paula Rudolph lived. After several days of living together, Mayfield returned to his wife on her birthday, May 19, 1977. From this point onward and for the three weeks leading up to the time of her murder, Mayfield maintained under oath numerous times (through two jury trials and several depositions) that he had *no sexual contact* with Linda Jo Edwards..[6]

On May 20, the next day, Linda attempted to commit suicide by overdosing on pills in her apartment. She left a suicide note addressed to Mayfield. Once Mayfield discovered Linda in an unresponsive state, he took her to a hospital where she was admitted. Mayfield later destroyed the suicide note despite a police investigation into the attempted suicide. While at the hospital, Mayfield called Paula Rudolph, a coworker, explained what had happened, and asked her to allow Linda to stay with her after leaving the hospital. Word spread fast causing other university faculty and coworkers to become aware of the situation. In the weeks following, James Mayfield was forced by the university president to submit a letter of resignation to the university and end his career.

Over the Memorial Day weekend, starting May 27, 1977, Mayfield helped Linda move into Paula's apartment while Paula was out of town. Although Paula made clear she

---

[6] After decades of lying, James Mayfield later admitted to perjury on this point among a number of others in a deposition given under a condition of immunity. These admissions will be discussed in detail in later sections.

didn't approve of Mayfield visiting her at the apartment, Mayfield admitted visiting her three times. The third time was on June 8, 1977, around Mayfield's birthday, where Linda asked Mayfield to stop by so she could give him several gifts. These gifts included articles of clothing and a "surprise" gift—a painting that Linda had created for Mayfield.

At 9:30 pm on June 9, 1977, both Paula Rudolph and Linda Jo Edwards returned to the apartment for the night. A witness who lived next door observed Paula's patio sliding door to be unlocked and open around this time. After being invited by a friend visiting from out of town, Paula left at 10:30 pm to have drinks at a nearby motel bar. Per her testimony, Paula did not lock the front door or the patio door as she left. She never saw Linda alive again.

On June 10, 1977, sometime between 12:30 and 12:45 am,[7] Paula returned home and encountered a figure standing in the den, Linda's room. Catching sight of him for only seconds around the hallway corner, the figure "whirled" at the sound of Paula, jumped out of view, and closed Linda's room door. Paula, believing it was Mayfield, said, "Don't worry, it's only me" and went straight to her bedroom. She heard the patio sliding door open and close moments after. After preparing for bed, she went to sleep around 12:50 am with her bedroom door open. During the night, she testified that she did not hear any sounds or disturbances. She discovered Linda's body sometime after 7:00 am and called the police. Paula then called Olene Harned—a co-worker friend at the library who also knew Linda.

_____

[7] The time frame of her return and her description of the "figure" will be detailed in a later section.

Cook was not identified as a suspect in this case until August of 1977. He was arrested within days of discovering that the fingerprints on the sliding door belonged to him.

## PART II

### Procedural Background

#### The 1ˢᵗ Trial and Appeal

In June of 1978, Cook was convicted for the 1977 capital murder of Linda Jo Edwards. He was sentenced to death. As noted in brackets, favorable evidence was withheld by the prosecution, and much of the evidence presented in the 1978 trial was later revealed to be false. Witnesses for the State testified, as relevant, to the following:

#### Paula Rudolph

- Paula Rudolph was a friend of Linda Jo Edwards, and she was living with Linda at the Embarcadero Apartments in June of 1977.

- Linda Jo Edwards was a 21-year-old secretary working in the English Department of Texas Eastern University in Tyler.

- Linda was having an affair with James Mayfield, a married Dean of the Learning Resource Center at Texas Eastern University. Essentially, Mayfield was the university's head librarian.

- On June 9, 1977, Paula got off work at 5:00 pm, went horseback riding, and then returned home to her apartment around 8:30 pm.

- Linda returned home around 9:15 to 9:30 pm.

8

- Paula left to have drinks with a friend around 10:30 pm.

- Paula returned to the apartment around 12:30 to 12:45 am.[8] The front door was closed but unlocked.

- As she entered, Paula saw the figure of a man in Linda's bedroom. His back was to Paula. The light in the bedroom was bright, and as the man turned around, they faced each other for a brief instant. But then he stepped out of her line of vision and shut the door. During the 1978 trial, Paula described the figure as:

    o Approximately her height or maybe a little taller.[9]

    o "a very slim person, slimmed hipped person, slim chested, but fairly broad shoulders for all that."[10]

    o "silver hair cut in a medium touching the ear fashion that men wear. The body was that of a Caucasian with a tan wearing white shorts of some fashion. I do not know if they were briefs, walking shorts, tennis shorts or exactly what style. The figure was sleek and slender."[11]

---

[8] The different time frames Paula testified that she returned home will be discussed in a later section.

[9] (I Tr. 3 RR 483-84).

[10] (I Tr. 3 RR 486).

[11] (I Tr. 3 RR 510-11).

9

- At trial, Paula identified Cook as the person she had seen that night. But she also testified that, on that night, she had assumed the man was Mayfield.[12] And she admitted at trial that she only briefly saw the figure.[13]

- Paula said that she then heard the sliding patio door open and close. She then went to bed. The next morning, she discovered Linda's mutilated body and called the police.

### Robert Hoehn

- Robert Hoehn testified that, on the same evening of June 9, 1977, he was visiting Cook at an apartment in the Embarcadero Apartment Complex where Cook was staying with a man named James Taylor, who was out of town.

---

[12] The story on how she initially thought she saw Mayfield but then came to believe it was actually Cook will be discussed in a later section.

[13] "Well, the minute I saw someone in her room, I assumed it was her boyfriend [Mayfield]. Who else could it be? It was a delicate situation and I just wanted out of it." (I Tr. 3 RR 489). Paula testified to the same effect in 1992 (which ended in mistrial):

Q: Why did you think that Jim Mayfield was there seeing Linda?

A: Because there was no reason for anyone else to be in that apartment. And he would have come—if he was going to come to see her, he would have come when I was not home.

Q: Why is that?

A: Because he knew that I did not approve of the relationship and did not –

Q: Could you think of any reason why any other man would be in that apartment with Linda Jo Edwards?

A: We, we were two single women, but she had never shown any inclination to me that she would have any other man in that apartment and it's not possible but I could think of no reason, there was no reason to my knowledge that anyone would have been in that apartment except Jim Mayfield.

(III Tr. 23 RR 1059-60).

10

- Hoehn was a 42-year-old homosexual hairdresser. He went to see Cook at Taylor's apartment between 10:35 pm and 10:45 pm. He said that when he arrived Cook was watching a movie on television called "The Sailor Who Fell From Grace With the Sea." After 5 minutes, they went to the pool for 20 minutes, and then returned to the apartment to watch the rest of the movie.

   [*This is in direct contradiction to Hoehn's grand jury testimony where he said that Cook had not paid attention to the movie.*[14] *This grand jury testimony was not turned over to the defense until after the commencement of the second trial in 1992—more than fourteen years after the first trial and after Hoehn had passed away.*]

- The trial court permitted the jury to see the portion of the movie seen by Hoehn in Cook's presence. The jury saw the part of the film where children poured a drugged mixture of milk down a cat's mouth to anesthetize it. The jury also saw the final portion of the film where boys gather a cleaver, large butcher knives and other sharp instruments, take them in satchels and sacks up a hill with the sailor, and anesthetize him with drugged tea. They prepare to mutilate him by putting on surgical gloves and gather closely around him with their knives.

   [*Although the State alleged that this cat-mutilation portion of the film excited Cook,*[15] *Hoehn claimed in his grand jury testimony that he had no memory of having*

---

[14] (KMC 9282) (Smith County Grand Jury Proceedings Held on October 17, 1992: Examination of Bob Hoehne, at *41).

[15] (I Tr. 4 RR 695-704).

11

*watched the "blood and guts scene"*[16] *and only knew about the scene because Officer Eddie Clark told him about it.*[17]

Juror:     You don't think he paid any attention to the movie?

Hoehn:     Not a whole lot, I mean he watched parts of it, but as far as paying any basic attention to it, why –

Juror:     In other words[,] you couldn't tell whether or not he got turned on by the blood and guts scene and all that?

Hoehn:     I didn't see the blood and guts scene, so – that's what I told A.D.

Juror:     You didn't see the blood and guts?

Hoehn:     I didn't see any blood and guts, he was telling me they cut up a – dissected a cat or something.

Juror:     He did tell you?

Hoehn:     No, [Tyler PD Officer] Eddie Clark told me. This movie, he was relating, trying to get me to relate the movie and I don't remember that part of it. Now they did kill the cat at the end.

Juror:     You don't think then, this boy paid any attention to the blood and guts?

Hoehn:     Well, I don't know whether that was on while we were at the pool or whether, because I don't remember seeing it and I got there approximately sometime between ten-thirty and quarter till eleven and the movie was over at eleven forty-five.[18]

*This is in direct contradiction to Hoehn's trial testimony that he and Cook were engaged in sexual relations just as the cat-mutilation scene was playing on TV.*][19]

---

[16] (KMC 9282) (Smith County Grand Jury Proceedings Held on October 17, 1992: Examination of Bob Hoehne, at *41).

[17] (KMC 9283) (Smith County Grand Jury Proceedings Held on October 17, 1992: Examination of Bob Hoehne, at *42).

[18] *Id.*

[19] (I Tr. 4 RR 695-704).

- Hoehn testified that on their way to the pool, he and Cook passed by Linda's bedroom window and Cook said that there was a good-looking girl who lived there.

- When the two returned to Taylor's apartment, they drank beer and watched the movie. When Hoehn returned from going to the bathroom, Cook was coming out of the kitchen with an eight-inch-serrated bread knife, saying "Let's cut it up or cut it out." Hoehn understood that as a joke and Cook put the knife down.

- Hoehn testified that there were portions of the film that were missed because he and Cook were having sexual relations. Upon returning from the pool, Hoehn claimed he performed fellatio on Cook and oral sex on Cook's anus "at intervals" while Cook lay facing the television.

   [*This is in "direct contradiction" to Hoehn's statement given in an interview[20] with the district attorney's office where he said that he and Cook had not had sexual relations.[21] The statement was not disclosed to the defense until October 18, 1992, and after Hoehn had passed away.*]

- Hoehn testified that Cook tried to have anal intercourse with him, failed, and then masturbated himself to climax.

   [*This is also inconsistent with Hoehn's withheld interview statement.*]

- At about 12:00 to 12:05 am, the two drove to a Krogers to get cigarettes, and Hoehn dropped Cook off at the front of the apartment complex around 12:30 to 12:35 pm—

---

[20] This Court's 1996 opinion erroneously conflated Hoehn's interview statement given to prosecutors with Hoehn's grand jury testimony. *See Cook v. State*, 940 S.W.2d 623, 626 (Tex. Crim. App. 1996). This does not change the fact that both items contain exculpatory testimony that is inconsistent with Hoehn's 1978 trial testimony.

[21] II Oct. 19, 1992 Hearing, Writ of Habeas Corpus, at *118-22.

but no later than 12:45 pm.[22] Hoehn testified that Cook was wearing blue and red "tennis style-type shorts" when he last saw him that night.

*Sgt. Doug Collard, Tyler Police Department*

- Sgt. Doug Collard of the Tyler Police Department was the forensic specialist in charge of the crime scene. He observed the body of the deceased lying on the floor of her bedroom. Sgt. Collard testified with the aid of slides made from photographs taken at the scene.

- The body was nude from the waist down.

- There were pieces of plaster under and around the body.

- A pair of shoes, panties, and blue jeans lay beside the deceased's feet.

- The panties had been cut across the crotch and up one side.

- The brassiere and blouse had been cut up the middle and pulled aside, and there were several places in the brassiere and blouse that had been cut through with a sharp instrument.

- The deceased's body had been severely mutilated: The right breast had a large stab wound; there were multiple wounds in the vaginal area, as well as in the throat area. On the lower right side of the bottom lip, one quarter of the lip was missing, and there was a long laceration from the edge of the mouth into the cheek area. A quantity of hair from the upper right-hand top of the head had been removed. According to Collard, the entire vagina had been cut out, leaving a large cavity that extended deep into the body. The missing part of the lip, vaginal parts, and most of the hair that was cut was never found.

---

[22] We will discuss the exact times testified to in a later section.

- A stocking was on one leg, while the other was missing and not found. Sgt. Collard testified that he believed it had been taken as a "souvenir" by the killer—which was not accurate.

  [*During the second trial, Sgt. Collard testified that "the entire vagina was cut out," placed in the missing stocking along with the other missing body parts and taken as a souvenir by Cook.[23] The "missing" stocking was later found by jurors in the pant leg of the deceased's jeans when the jurors examined the physical evidence during deliberations in Cook's second trial in 1992. A mistrial was declared after the jury could not reach a verdict.*][24]

- Sgt. Collard deduced that a plaster statue, with pieces of plaster broken loose, had been used to strike the deceased. It appeared that the victim had been lying on the bed when struck by the statue. No defensive wounds were found.

- After qualifying Sgt. Collard as a fingerprint expert, the State presented fingerprint evidence—specifically the middle finger, ring finger, and pinky finger of the left hand on the patio door exterior. According to Sgt. Collard, these fingerprints matched Cook's. Sgt. Collard testified that the fingerprints were 6-12 hours old, which put Cook at the crime scene at the time of the murder.

  [*This testimony was later revealed as false and misleading when Sgt. Collard testified at Cook's pretrial hearing in 1992 that "scientific research does not support [this] opinion."*][25]

---

[23] (III Tr. 21 RR 410).

[24] *Cook v. State*, 940 S.W.2d 623, 637 (Tex. Crim. App. 1996) (Baird, J., concurring and dissenting).

[25] Sgt. Collard's participation in the prosecutorial misrepresentation to the jury will be discussed in a later section.

Sgt. Collard testified that the fingerprints would have been made from the inside as the person was closing the patio door.

### *Dr. V. Gonzalez, Medical Examiner*

- Dr. Gonzalez, a pathologist who examined the body at the scene and conducted a later autopsy, testified that time of death was around midnight give or take several hours.

- Dr. Gonzalez testified that he believed the chronological order of wounds began with the wounds to the head (caused by the statue). He stated that it was unclear whether the neck wounds, chest wounds, or vaginal wounds were second or third due to massive bleeding.

- Overall, he identified at least ten blows to the head and a total of 20-30 stab wounds. These wounds were consistent with blunt force from the statue, a pair of scissors, and a large carving knife. Among the wounds, Dr. Gonzalez testified to the following:

  o The deceased had multiple lacerations to the head and the scalp was exposed. There was injury to the left eye and multiple contusions and bruises were found on the brain.

  o The blunt force to the head from the statue likely knocked the deceased unconscious but was not enough to cause her death.

  o Scissors were used to cut away part of her lip and stab her neck.

  o There were stab wounds to the back that lacerated the victim's diaphragm, severed a rib, and lacerated part of a lung.

  o There were three wounds in the pubic region. The pelvic cavity was filled with blood, which meant that the victim was still alive when these wounds were inflicted.

- The breast was stabbed and the liver penetrated.

- A large carving knife was used to sever the internal carotid artery and jugular vein which likely caused Linda's death.

- The vaginal region was completely mutilated, and parts were removed. Because of the extensive lacerations to this region and the amount of blood, it was impossible to detect any evidence of semen.

### *Rodney and Randy Dykes*

- Rodney Dykes, age 13, and Randy Dykes, age 18, had visited their uncle, James Taylor, at his Embarcadero apartment one or two days before the murder. Both testified that Cook told them about the girl in the apartment who was "playing with herself." Cook pointed out Linda's apartment to them one night as they passed by.

- Randy Dykes testified that he had picked up Cook at about 10:00 am the day after the murder to take him to look for a job. When they heard on the radio about the murder, Cook looked "somewhat shocked." Dykes said that Cook had Dykes take him by the apartment to get a paper grocery bag with a change of clothes so he could spend the night in Jacksonville.

[*The defense was not allowed to question the Dykes brothers in any of the trials about exculpatory statements they had given before the grand jury which was not disclosed to defense until years after the first trial.*]

### *Edward "Shyster" Scott Jackson*

- Jackson was a 22-year-old inmate at the Smith County Jail indicted for first degree murder. He denied any existing agreements with prosecutors in exchange for his testimony.

- He testified that he met Cook at the jail in late August of 1977.

- Jackson testified that Cook told him he had killed Linda Jo Edwards by stabbing her in several places, had gouged out her vagina, cut hair from her head, and thought he had been seen by another lady when he was leaving the apartment.

- Jackson also testified that Cook had made statements to him expressing violent thoughts or fantasies against dark-haired women.
  [*Jackson later admitted in an 1978 interview with the Dallas Morning News and a Texas Ranger, and again at Cook's pretrial writ hearing in 1992 that this testimony was a total fabrication—"I lied on him to save myself."*][26]

In 1987, this Court affirmed the 1978 conviction and sentence of death.[27] This Court held that "[t]he evidence was sufficient to sustain a finding that [Cook] caused the death of

---

[26] The level of prosecutorial involvement in Jackson's testimony will be discussed in a later section.

[27] *Cook v. State*, 741 S.W.2d 928 (Tex. Crim. App. 1987). Judge Clinton noted in his dissent that there were a number of suspicious and troubling elements to the case that were largely ignored including:

(1)    the fact that a number of witnesses *including Robert Hoehn* had to be given immunity in exchange for their testimonies;

(2)    Hoehn's testimony was inconsistent with Paula's description of the killer's clothing;

(3)    the lack of evidence of a struggle suggested that Linda knew her assailant;

(4)    nowhere in Paula Rudolph's police report did she indicate she was able to identify the assailant; and

(5)    all jail records showing Edward Jackson and Cook to be housed near each other suspiciously "were either missing or had not been kept for that period."

*Id*. at 946-47 (Clinton, J., dissenting). "The evidence may be sufficient when one picks and chooses certain items, but a rational reviewer of facts is left with serious questions whether a rational trier of fact could find guilt beyond a reasonable doubt." *Id*. at 947 (Clinton, J., dissenting).

[Linda]."[28] Significantly, our 1987 holding was based on evidence which has since been discredited, such as:

- "Paula Rudolph testified she saw [Cook] in her apartment at the time of the crime."[29]

  [*This was her testimony during trial, but it was revealed that she had told police and multiple others that Mayfield was the person she believed she saw, and that information is consistent with the description of the person she saw as having silver hair.*]

- "Fingerprint evidence also placed [Cook] in the apartment within the time the crime was committed."[30]

  [*The fingerprint expert later admitted that there was no way to scientifically estimate when the fingerprints had been left and that he deliberately created a false impression to the jury at the behest of the State.*]

- "[Cook's] oral statement to [Edward Scott] Jackson revealed how he committed the crime . . . ."[31]

  [*Jackson has since admitted that his testimony was a total fabrication.*]

This Court also failed to find error in inflammatory comments made by the prosecution throughout the trial that:

---

[28] *Cook*, 741 S.W.2d at 935.

[29] *Id.*

[30] *Id.* at 935.

[31] *Id.* at 934-95.

- Cook was a "killer,"

- Cook was a "pervert" who "wanted to look through that window."

- Cook had "demon cult friends," and

- the prosecutor "wouldn't be surprised if [Cook] didn't eat [Linda's] body parts."[32]

State action prompted the United States Supreme Court to vacate this Court's 1987 opinion in 1988 and remand the case to this Court for consideration of an erroneously decided punishment issue.[33] Cook claimed that his right to counsel had been violated where defense counsel was not notified in advance that there would be psychiatric examination that would encompass the issue of future dangerousness. On remand, in 1991, this Court reversed Cook's conviction because of the admission of a psychiatrist's testimony during sentencing on the issue of future dangerousness.[34] This was error because the expert had examined Cook without first consulting Cook's counsel.[35]

---

[32] *Id.* at 939.

[33] *Cook v. Texas*, 488 U.S. 807 (1988). The case was remanded to this Court for consideration in light of *Satterwhite v. Texas*, 486 U.S. 249 (1988), which dealt with Fifth and Sixth Amendment violations due to admission of the same expert's (Dr. Grigson) testimony at punishment.

[34] *Cook v. State*, 821 S.W.2d 600 (Tex. Crim. App. 1991).

[35] *See Penry v. State*, 178 S.W.3d 782, 784 n.3 (Tex. Crim. App. 2005) ("Before September 1, 1991, in capital murder cases that were reversed on the basis of error during punishment only, the cases were remanded for a new trial on guilt and punishment. The legislature amended Texas Code of Criminal Procedure Article 44.29 in 1991 to provide for a remand on punishment only when reversible error occurred during punishment. Act of May 17, 1991, 72nd Leg., R.S., ch. 838, § 2, 1991 Tex. Gen. Laws 2898, 2900.").

### *The Disclosure of Exculpatory Evidence, Cook's 1992 Pre-trial Writ Application, and the 2nd Trial*

In 1991 and 1992, the State revealed to the defense, for the first time, that exculpatory evidence had been withheld for over thirteen years. Except for the psychiatric examination, no other state misconduct had been addressed in the prior appeal. As a result, on October 15, 1992, Cook filed a pretrial habeas corpus petition arguing that due process and double jeopardy principles in both the federal and state constitutions barred his retrial because prosecutorial misconduct had denied him the ability to effectively defend himself.

The trial court decided not to stay Cook's trial even though his writ application was still pending. Cook's second trial was held from October 30, 1992, to December 18, 1992, in the District Court of Williamson County (venue was moved *sua sponte*). The second trial resulted in a mistrial based on the inability of the jury to reach a unanimous verdict.[36] After discharging the jury, the trial court set the case for trial, again in Williamson County, for March 26, 1993.

Before the third trial began, the trial court denied Cook's pretrial writ application by order dated January 29, 1993. Along with that order, the trial court made extensive findings regarding Cook's claims that evidence had been improperly withheld prior to Cook's first trial in 1978:

---

[36] "We note that [Cook's] second trial fell victim to the State's complacency during jury deliberations when the jury found the victim's sock in the leg of the victim's pants after the State had argued that [Cook] had carried off the souvenir body parts in the missing sock. The jury deadlocked and [Cook's] second trial ended in a mistrial." *Cook v. State*, 940 S.W.2d 623, 637 (Tex. Crim. App. 1996) (Baird, J., concurring and dissenting).

- *Mayfield's daughter, Louella Mayfield, had made death threats against Linda Jo Edwards.*

During its investigation of the crime, Smith County District Attorney's Office found that Mayfield's sixteen-year-old daughter, Louella, had made repeated death threats against Linda to third parties as well as one directly to Linda just a few days before the murder. The investigation also revealed that Louella falsely identified herself as an investigator with the Tyler Police Department to the manager of the apartment complex where Linda was killed.

  o A report drafted by a Tyler Police Department sergeant stated that he "personally knows Louella to be a mentally and emotionally unstable, very hyperactive and a pathological liar."

  o The only two witnesses who supported James Mayfield's alibi that he was asleep at his wife's house at the time Linda was murdered were his wife and Louella.[37]

- *Edward Jackson's testimony at the first trial was completely false.*

Prior to the first trial the State withheld from the defense the fact that there was a deal made with Edward "Shyster" Jackson, who testified that Cook had confessed to him that he committed the murder of Linda. The State misrepresented that it made no deal with Jackson for his own first degree murder charge, but after he was released, Jackson admitted that his trial testimony was a total fabrication made convincingly possible with help from the State. At the pretrial hearing, Jackson testified that he "lied" at Cook's first trial "to save [himself]."[38]

---

[37] During the third trial, Elfriede was asked if her husband was home on the night of June 9, 1977. The *only* thing Elfriede could remember was that both James Mayfield and their daughter were at home with her that night. (III Tr. 24 RR 1359). She repeatedly asserted that she could not remember anything else about that night. (III Tr. 24 RR 1359-60). Furthermore, Elfriede was not interviewed by police until the spring of 1992—nearly 14 years after the murder. *Id.*

[38] Pretrial Hr'g, Test. Edward Scott Jackson, Nov. 25, 1992, at *6-7.

22

In a pretrial hearing leading up to the 1992 trial, Jackson testified, consistent with his 1978 interview, that his "entire testimony was orchestrated by the District Attorney's Office" after a prosecutor approached him to testify in exchange for lowering his first degree murder charge to voluntary manslaughter.[39] Jackson was shown pictures of the crime scene and body, and then told details about the crime scene and investigation.[40] In exchange, instead of pursuing a life sentence as the prosecutor promised during Cook's trial, the District Attorney's Office offered Jackson a plea bargain for only two years with time served.[41] This plea bargain was reached only four to six weeks after Cook's 1978 trial.

> Defense: Mr. Jackson, I'm going to show you volume six of the Statement of Facts in the State of Texas versus Kerry Max Cook, page one thousand one hundred. This is [the prosecutor] speaking to the jury during closing statement.
>
> ***
>
> By [the prosecutor], page one thousand one hundred:
>
>> "Defense Attorney wants to talk about Edward Scott Jackson and the deal he had with the State of Texas. That man has got no deal with the State of Texas. I will be yelling for his head before this rail of justice just like I am on this killer, and it will fall. I don't make deals with killers. I don't trade one man's life for another."
>
> My question to you, Mr. Jackson: When [the prosecutor] appeared a month or six weeks later with you for your plea bargain, did [the prosecutor] yell for your head before the rails of justice?

---

[39] *Id.*

[40] *Id.* at 8-9.

[41] *Id.*

Jackson:     No, sir. He didn't.

Defense:     Did [the prosecutor] recommend a life sentence that he promised the jury he would recommend?

Jackson:     No, sir. He didn't.

Defense:     Did you, in fact, get the two year deal and have your murder charge reduced to manslaughter as had been promised to you?

Jackson:     Yes, sir. I got exactly what I was promised.

Defense:     Was your deal with the district attorney's office, was that of public knowledge or was that secret?

Jackson:     It was something that was done covertly.

Defense:     What do you meant [sic] by "covertly?"

Jackson:     Well, it was secretly. It was only known amongst the prosecutors and myself. I think I may have told a friend of mine in confidence.

             ***

Defense:     To your knowledge, did the district attorney's office keep it a secret from your own lawyer?

Jackson:     I believe so.

             ***

Defense:     Do you recall how many days you spent in prison after [the prosecutor] reduced your murder charge to manslaughter; gave you two years?

Jackson:     No, sir. I don't. But I know it wasn't more than a couple of weeks. I was given time served.[42]

- *Cook had been to Linda Jo Edwards's apartment 3 to 4 days before the murder contradicting the State's theory.*

---

[42] Pretrial Hr'g, Test. Edward Scott Jackson, Nov. 25, 1992, at *11-14.

24

In order to fit the killer's psychological profile, the State relied on the theory that Cook and Linda did not know each other.[43] The District Attorney's Office failed to reveal to Cook that it possessed evidence that Cook and Linda did know each other. Despite having this evidence, the State pressed forward in asserting during the first trial that Cook did not know Linda, and had never been to her apartment other than on the night of the murder. However, the State had grand jury testimony by Rodney Dykes that Cook told Rodney he met Linda at the pool three or four days prior to her murder and then went to her apartment, where he received "passion marks on his neck."[44] In fact, Randy Dykes told police and told the grand jury that Cook told them that he had gone to Linda's apartment, upon her invitation, a few days before the murder where they had consensual physical contact. Rodney Dykes confirmed that Cook had marks on his neck that Cook told him were put there as "passion marks" by Linda.[45]

- *Robert Hoehn made prior inconsistent statements and was unavailable for impeachment at Cook's second and third trials.*

---

[43] The fact that they knew each other provides an innocent explanation for Cook's fingerprints on the sliding door and undercuts the State's ability to match Cook to the profile of the killer. These will be discussed in later section.

[44] (KMC 9210-41) ("Grand Jury Proceedings: Transcript of Testimony of Randy Dykes," Oct. 3, 1977); *see also* (KMC 1457) (Statement of Rodney Dykes).

[45] In a police report dated Dec. 12, 1991, Rodney Dykes was interviewed again by the then-lead prosecutor on the case. During the interview, Dykes again confirmed that he saw a "bunch of hickies" on Cook's neck days before the murder. (KMC 1081).

It is also concerning that the interview was conducted in an intimidating manner. According to the police report, Dykes complained that he did not "particularly care for [the prosecutor] because he would always *yell and bang on his desk* whenever Mr. Dykes could not recall some of the exact details of his testimony." (KMC 1081) (emphasis added). Though he was the State's witness, Dykes felt "intimidated" by the assistant district attorney and wanted the interview to end. (KMC 1081).

The State failed to reveal to Cook at his first trial a prior inconsistent statement by Robert Hoehn. Hoehn testified at the first trial that he had homosexual sex with Cook shortly before the murder, but Hoehn told prosecutors during an interview that, although he himself was a homosexual, he had not had sex with Cook.

- Also, Robert Hoehn testified at the first trial that Cook had watched, and became aroused by, the movie *The Sailor Who Fell From Grace with the Sea*. But, before the grand jury, Hoehn said that Cook paid no attention to the movie. The grand jury testimony was first disclosed to the defense some time in 1991 or 1992—thirteen to fourteen years after his initial testimony. But Hoehn died before he could ever be impeached with this information.

- The State did not disclose Hoehn's testimony before the grand jury until after commencement of Cook's second trial and after Hoehn's death.

- Hoehn's death made it impossible for Cook to impeach Hoehn's testimony with Hoehn's prior inconsistent statements.

- The State did not disclose the fact that Hoehn testified before the grand jury that Cook told him about having gone to a woman's apartment a few days before the murder and that she had left "passion marks" on Cook's neck.[46]

- Cook continues to maintain that even though the State finally disclosed Hoehn's grand jury testimony, some of the pages were missing from the disclosure, and it was discovered that the District Attorney's office had possession of additional impeachment information that it did not turn over to the defense.

---

[46] This testimony corroborates the Dykes brothers' stories concerning Cook's sexual encounter with Linda several days before the murder.

26

*[This information can be found in "Appellant's Opening Brief to the Court of Criminal Appeals," filed July 17, 1995, at 16-17. The State has previously conceded that the facts set forth in that Brief are "accurately stated."]*[47]

- *The "expert" testimony regarding Cook's fingerprints at the scene was false and misleading.*

The State introduced misleading testimony at Cook's first trial as to the age of the fingerprints found at the scene attributed to Cook. The State's fingerprint "expert" witness, Sgt. Collard, testified that the fingerprints were six to twelve hours old, which put Cook at the apartment during the time of the murder. However, Sgt. Collard later admitted in writing, and in response to a grievance filed against him in 1978, that his "expert opinion" regarding the age of the fingerprints was not in fact an expert opinion. He admitted it was a mistake which could not be supported by any scientific evidence or by any other latent fingerprint expert. Sgt. Collard also admitted that the district attorney had pressured him to present the false and misleading evidence against Sgt. Collard's wishes. Sgt. Collard's written statement was not disclosed to Cook until 1992:

> While processing and upon discovery of the latent I [Collard] made a general statement (I thought only to myself and my other I.D. Officer.) It was something to the effect that the latent has got to be the suspects and that from appearance that I felt it was it could possibly be 6 to 12 hours old. This statement was overheard by one of the criminal investigators and later relayed to the Smith County District Attorney, A.D. Clark, III.
>
> The bond hearing in this case came unexpectedly. I was given only a short period of time to appear. I was contacted by the District Attorney who asked me if I had made the statement regarding the approximate age of the latent print. I informed him that I had made the statement, but that it was not intended for use and that there was no positive or scientific way that it could be supported. He advised me that if I had made the statement, it was therefore an opinion. He also

---

[47] *Cook*, 940 S.W.2d at 631 n.6 (Baird, J., concurring and dissenting).

advised that I would possibly be asked if I had formed an opinion as to the age of the latent print. I informed him that when I made the statement, I believed it to be true, but that I still could not support it if challenged. It was only a statement/opinion (normally not made), that no proof or testing exists, it cannot be supported, and that I feel it should not be used. I was told that I will be asked if I had formed an opinion while at the scene. I then requested the District Attorney if he insisted, to follow up with the fact that is only my opinion and that of no one else. While testifying in this hearing I was asked if I had formed an opinion as to how long the prints had been present on the door frame. I stated that I did form an opinion, and when asked for the opinion stated that it was six to twelve hours old.

\*\*\*

IT SHOULD BE NOTED:

That this issue was testified to at the Bond Hearing, the Writ of Habeas Corpus Hearing, and in the final trial. Prior to each of my appearances, I requested this portion of the evidence not be used and each time it was still used. [48]

## *The 3rd Trial*

Cook was tried a third time, was convicted of capital murder, and was again sentenced to death in 1994. This time, most of the exculpatory evidence that was withheld prior to the first trial was disclosed. But again, this Court reversed Cook's conviction.[49] Since Robert Hoehn died before the third trial, he could not be impeached with his prior inconsistent testimony that he gave before the grand jury. Nevertheless, the trial court

---

[48] (KMC 1402-03) ("[Collard's] Response to International Association for Identification").

[49] *Cook*, 940 S.W.2d at 624.

allowed the State to use Hoehn's testimony from the first trial, but not his grand jury testimony.[50] This Court found that to be in violation of Cook's due process rights:

> Hoehn's testimony was crucial as it placed appellant near the scene of the murder in an aroused emotional state at the time of its commission. Hoehn's trial testimony also contradicted his statement to the police concerning whether appellant watched a movie on television which, the State averred at trial, inflamed appellant just prior to the time the murder was committed. Use of Hoehn's testimony at appellant's third trial and the reliability of the proceedings against him. Accordingly, reversal of appellant's conviction is mandated by the Due Process Clause of the United States Constitution as well as the Due Course of Law provision of the Texas Constitution.[51]

One of the witnesses at Cook's third trial was Olene Harned. Ms. Harned took over as head of the university library after Mayfield was fired in June of 1977. She testified that she arrived at the scene of the murder because Paula Rudolph called her that morning to tell her that Linda had been killed. She testified that Paula had told her that she had come in late the night before "and she thought she had seen Jim Mayfield jump back and close the door." Ms. Harned confirmed that "on a number of occasions" Paula told her that she thought she saw Mayfield that night in Linda's bedroom. Ms. Harned also testified that Mayfield was thinking about going to work in Houston, and he expressed concern that, if he went to Houston, Linda might follow him. Ms. Harned confirmed that Mayfield played

---

[50] Hoehn's grand jury testimony would have been admissible under TEX. R. EVID. 806.

[51] *Id*. at 627.

tennis "a great deal," and a "common outfit" for him to wear when he wasn't working was "white tennis shorts."[52]

A point that was not discussed in this Court's 1996 opinion was that the defense attempted to admit evidence of a book titled *The Sexual Criminal—A Psychoanalytical Study* by J. Paul De River during the 1994 trial. This book contained graphic illustrations of "lust murders" and other types of sexual homicide scenes resembling Linda's murder.[53] The defense alleged that Mayfield had ordered and read the book before killing Linda. The trial court, however, did not allow the defense to question witnesses about this book nor admit the book into evidence because there was no proof at the time that Mayfield had ever seen the book.[54]

Defense counsel, however, was allowed to question Mayfield's colleague, Dr. Fredrick G. ("Gary") Mears, outside the presence of the jury. Dr. Mears testified that prior to Linda's murder, he discovered the book, *The Sexual Criminal*, in the library. Dr. Mears said he did not order the book and that the only other person who could have ordered it was Mayfield. Dr. Mears said that, after the murder, he contacted the authorities because "the

---

[52] Paula Rudolph consistently testified in all three trials that the figure she saw on the night of the murder wore white shorts.

[53] *See* (KMC 0477-82) (showing nearly identical side-by-side comparisons of crime scene photos and pictures taken from the book, *The Sexual Criminal—A Psychoanalytical Study* by J. Paul De River, especially in terms of the presentation of the body as posed by the killer and the nature of the wounds inflicted).

[54] James Mayfield, in his 2016 interview under immunity, admitted that Dr. Mears showed him and confronted him about the book. (KMC 9054).

book was so close" to the autopsy, he "thought the authorities should look at that." Dr. Mears also testified that after the murder, Mayfield told him that Paula had identified him at the crime scene and asked him for help in taking a polygraph test. Dr. Mears asserted that Mayfield had a temper, and he had seen him display "very inappropriate" and "tremendous anger and belligerence" toward his daughter when they were playing tennis. Dr. Mears stated that, at some point after the murder, he bought a gun because he was afraid of Mayfield. Significantly, the jury heard none of Dr. Mears's testimony.

Mayfield's suspicious behavior following Linda's murder was apparent to more than just Dr. Mears. After being informed that he had been "cleared" as a suspect following Cook's arrest, Mayfield told another witness, "No matter how serious the trouble you're in, you can get out of almost anything if you have enough money."[55] A colleague also caught Mayfield "surreptitiously" going through Linda's desk calendar and belongings at the University the day after the murder.[56] Mayfield was told to never return.

At the third trial, the defense called Dr. Andrew Szarka, who testified that on the evening of June 9, 1977, the night Linda was murdered, Linda had gone by Dr. Szarka's house to visit. Linda told Dr. Szarka that she had just been over to see Mayfield, and she had told him she was dating other men, or that she was going to start dating other men, and that Mayfield "was very upset about it," and that "he didn't want her to see anyone else."

---

[55] Ex. KK. (Affidavit of Ann White, dated 11/7/1991).

[56] Ex. EE (Gregory Off at 1).

Another witness at the third trial (and second trial) was Bob Wickham. Wickham was a volunteer reserve deputy for the Smith County Sherriff's Department during Cook's first trial. During the first trial's jury selection, Wickham, on his first escort duty assignment, was instructed to escort Cook from the courtroom to the basement and deliver him to a jailer. He testified at Cook's second and third trials, roughly a decade and half later, that Cook told him back in 1978 that "I killed her and I don't give a sh_t what they do to me." Although Wickham *did not tell anyone* when it purportedly happened, he told a friend—Glenn Miller (a DPS officer)—*a few weeks later*. No one else heard the statement. Wickham didn't report the statement to any investigating authorities for 13 years, just prior to the second trial.

After reversing Cook's conviction in the third trial, this Court held that a retrial was not barred because it was still "possible" to retry Cook.[57] This Court remanded the case to the trial court for "further proceedings consistent with this opinion."[58] The State maintained at the time that it intended to try Cook a fourth time for capital murder.

### *The 4th Prosecution of Cook for Capital Murder*

In February of 1999, on the verge Cook's fourth trial, the State requested a continuance until new DNA testing, an emerging forensic technology, could be conducted

---

[57] *Cook*, 940 S.W.2d at 627.

[58] *Id*. at 628.

on semen stains found on Linda's underwear and on a hair found on Linda's buttocks. The trial court denied the continuance.

Immediately before the fourth trial was to begin, and before DNA results were available, on or about February 16, 1999, the State offered Cook a negotiated plea agreement. According to the transcript from the plea proceeding, a jury panel was waiting in the hallway. Maintaining that Cook had gruesomely murdered Linda Jo Edwards, the State offered Cook a 20-year sentence in exchange for a "no contest" plea for murder. Because he would be given credit for time served, accepting the State's offer would result in no further incarceration. Cook accepted the offer, pled no contest, was found guilty, was sentenced to twenty years, and was released with time served.

In connection with this plea agreement, Cook signed a Stipulation of Evidence on February 16, 1999, agreeing to stipulate that if he were tried, the State would call the following witnesses and they would testify to the following:

*James Taylor would testify:*
- that Cook was staying at Taylor's apartment;

- that Cook had no job, no car, and no money;

- that after the murder, Cook told Taylor that he did not know the girl or about the apartment.


*Doug Collard would testify:*
- that Linda Jo Edwards was sexually mutilated;

- that fingerprints on the patio sliding door were Cook's;

33

- that a statue found in Linda's bedroom belonged on the buffet just inside the sliding glass door.

*Paula Rudolph would testify*:

- that she returned home late on the night of the murder and saw a person she identified as Cook in the apartment;

- that the person she saw in the apartment was not wearing glasses and Mayfield wore glasses.

*Bob Wickham would testify*:

- that he was a reserve deputy during 1978 in the first trial of Cook;

- that he had a conversation with Cook in which Cook stated that he had killed her and "don't give a sh_t what they [the jury] do to me;"

- that he told his friend Glenn Miller about the conversation weeks later.

*Allen Weckerling would testify:*

- that based on experience and training the person who left fingerprints was inside the apartment.

*David Hanners would testify:*[59]

---

[59] Hanners has since submitted an affidavit (2016) stating the following:

I have been informed that one issue on which the State may seek my testimony concerns statements Mr. Cook made to me when I initially interviewed him, falsely denying that he knew Linda Jo Edwards or had ever been in her apartment. I have no problems testifying regarding those facts. It should be noted, however, that Mr. Cook long ago admitted to me that this initial statement was false, and explained the reasons why he feared telling me the truth initially. I have spoken with him about this issue on more than one occasion. While I was not happy about the fact

34

- that he was a reporter and Cook told him he "didn't know the woman," had never been inside the apartment, and had left the fingerprint on the door window-peeping.

*David Barron would testify*:

- that he was a reporter and Cook told him he "did not know Linda Jo Edwards."

*Nita Wilson would testify*:

- that she was a reporter for Region 56 news in Tyler;

- that Cook said he did not know the victim and says the fingerprint is "mine, I never went inside the apartment."

*Rodney Dykes would testify:*

- that he was 12-years-old at the time of the murder;

- that Cook pointed out a window a day or so before the murder;

- that Dykes showed the window to Officer Eddie Clark;

- that Cook said he had watched a girl undressing in the window.

*Randy Dykes would testify:*

- that he showed Officer Eddie Clark the window where Cook said he'd seen a girl undressing;

- that he took Cook to Jacksonville the day after the murder.

*Dr. Virgil Gonzales would testify*:

---

that he lied to me initially (and told him so very clearly), based on everything that Mr. Cook reported to me—as well as everything I know from my own investigation about the history of his case, and his circumstances at the time of our initial interview—his explanation was both satisfactory and credible in my mind.

(KMC 0017-18).

- that he performed the autopsy on Linda's body and what his findings were.

*Eddie Clark would testify*:

- that he was a Tyler Police officer assigned to this case and that the murder happened in Tyler and he found the murder weapons at the scene;

- that the apartment pointed out to him by the Dykes brothers was that of the victim.

In addition, Cook stipulated that, with the exception of Hoehn's testimony, the court could take judicial notice of the evidence from the third trial. This collection of evidence obviously comprised the State's case against Cook. This list does not, however, include all of the exculpatory evidence that would have been offered by the defense.

# **PART III**

## **The Discovery of New Evidence in the Case**

After the February 1999 plea agreement and sentencing, new evidence has been discovered in this case. On April 8, 1999, the results of the DNA testing on Linda's underwear were reported by a DPS forensics lab.[60] Cook was excluded by those tests as a contributor of the semen on Linda's underwear.[61] The DNA profile from the sperm fraction of the semen stain was determined to be consistent with James Mayfield.[62]

---

[60] (KMC 0789-90).

[61] *Id*.

[62] (KMC 0790).

Mayfield testified at two of Cook's trials and in a deposition taken on February 1, 1978. During each one of these proceedings, he consistently denied under oath having any sexual contact with Linda for approximately three weeks before her death.

Cook also requested that a hair with a bloody root discovered on Linda's buttocks be tested. Despite Cook's request to test it, the State ordered it destroyed before the testing could take place.[63]

Additional items were tested for DNA testing in 2012.[64] The items tested were cuttings from Linda's stained underwear, jeans, and bra; a hair from Linda's bra; swabs of blood from a broken glass terrarium lid from the scene; bloody swabs and a cigarette butt from the scene; and swabs from the knife. Cook's DNA was not found on any of the items tested.

On April 5, 2016, Mayfield was interviewed in Houston—thirty-eight years after his deposition testimony under oath in this case and a quarter-century after giving testimony in the second trial.[65] Those present were Smith County District Attorneys Matt Bingham and Allen Gardner, Buck Files (Mayfield's attorney), Gary Udashen (Cook's habeas counsel), Bruce Anton (Cook's habeas counsel), Officer Keven Fite, (Smith County District Attorney's Office Investigator), and Elfriede Mayfield (James Mayfield's wife). In

---

[63] This will be discussed in a later section.

[64] App. 5 to St. Br. in Opp'n, at 14-33.

[65] (KMC 8956-62).

light of his semen and DNA being found on Linda's panties, Mayfield agreed to give this interview in exchange for immunity from prosecution.[66] During this interview, Mayfield made a number of remarkable admissions for the first time. They included the following:

- Despite previously claiming he did not have sex with Linda Jo Edwards for three weeks, Mayfield admitted for the first time to having had sex with her less than two days before her murder on his birthday (June 8, 1977).[67] This also contradicted his earlier representation that he had switched to a more paternal relationship following the suicide attempt.

- Mayfield admitted that his affair with Linda had "ruined him" and that he knew he needed to avoid her. He also admitted contrary to prior testimony that he had made comments to that effect to others immediately following the murder.[68]

- Mayfield admitted that, in addition to his career ending, his marriage was in jeopardy. His wife had already consulted an attorney for a possible divorce. If his wife had discovered any further sexual encounters with Linda, his marriage would be over. "I wasn't going to destroy my marriage for Linda."[69]

- Yet, Mayfield admitted that he could not help himself when he was near Linda. Whenever they were together, it would result in a sexual encounter.

---

[66] (KMC 8961).

[67] (KMC 8981-83).

[68] (KMC 9050-51). *See also* (KMC 0005) ("Affidavit of Ann White" stating that while at the murder scene, "Mr. Mayfield became angry and told me that [Linda] had ruined him, and that she had cost him his job and caused a lot of problems for him.").

[69] (KMC 9018-19).

- Furthermore, Mayfield acknowledged that Linda was very reliant on Mayfield for her daily life needs. "If she needed help, I was going to help her. I – that's the way we [Mayfield and his wife] felt about her. We bought her clothes, we did everything for her."[70] Additionally, since the sexual encounter, Mayfield acknowledged that Linda had increasingly sought him out for help addressing car trouble and apartment hunting.[71]

- Following Linda's murder, Mayfield acknowledged becoming aware that Paula Rudolph told others at the university that she had seen him the night before in Linda's room.[72]

- Mayfield also admitted knowing about the book, *The Sexual Criminal—A Psychoanalytical Study* by J. Paul De River, and its violently graphic nature. Though he denied being responsible for ordering the book, he acknowledged being in a dispute with Dr. Mears, a psychologist at the university, about its presence in the library. Counter to Dr. Mears's stance that the graphic nature of the book made it inappropriate for the library, Mayfield testified that he refused to remove the book from the library collection.[73]

---

[70] (KMC 9017).

[71] Hours before the murder, Mayfield and his wife returned home from dog training to find Linda waiting for him in front of their house. Linda suspiciously claimed she had just been visiting the neighbors. This was Mayfield's third encounter with Linda that day. Mayfield described Linda first approaching him in the dining hall at noon while he was with other members of the faculty. The second encounter was when Linda asked him to meet at a Dairy Queen to look at an apartment that wasn't available yet. During this third encounter, Linda asked Mayfield to look at her car.

[72] (KMC 9029-31).

[73] (KMC 9052-58).

- Finally, Mayfield denied ever asking Dr. Mears for help, in light of his Ph.D. in psychology, with "beating a polygraph."[74] Mayfield did admit to failing his first polygraph before passing a second.[75]

In short, by these admissions, Mayfield admitted to perjuring himself in his multiple pretrial depositions and two trials.


Other notable evidence adduced since 1999 include:

*Affidavit of Cheryl Wattley (June 3, 2016).*

As relevant, Wattley, one of Cook's attorneys in 1999, testified that nobody on Cook's defense team was ever informed of a 1999 "reinvestigation" conducted by the Tyler Police Department. Additionally, no one on the defense team was ever informed about a State polygraph examination of Mayfield leading up to the 1999 trial. Wattley also attested to seeing for the first time a taped interview of Bea Taylor by a Texas Ranger. In the interview, Bea Taylor, told law enforcement what Paula Rudolph told her in the first few hours after discovering Linda's body: "They're going to take me down for a statement, but I'm not telling the police anything."[76]

*Affidavit of James McCloskey (June 21, 2016).*[77]

---

[74] (KMC 9058-59).

[75] (KMC 9070-71).

[76] (KMC 8886).

[77] James McCloskey is a co-founder of Centurion Ministries, a non-profit organization that assists those who claim to be wrongly convicted.

40

In an affidavit, James McCloskey asserted that a private investigator and himself interviewed Robert Wickham's former employer and direct supervisor. During the interview, the owner of a restaurant business employing Wickham stated he believed Wickham was involved in a break-in at his business and theft of money from his safe. The owner further stated that he did not trust Wickham and believed him capable of such an act. Wickham's direct supervisor from that employment gave a similar accounting. He quickly became "fedup" after receiving several credible sexual harassment complaints against Wickham. Between the sexual harassment complaints and the suspicions about the break-in, he soon fired Wickham. Additionally, both believed Wickham to be a "wannabe" police officer after he gave away free meals to police officers. Both interviewees also believed him to be a "dishonest and untruthful" person.

### *Interview of Bea Taylor (transcribed April 5, 2016).* [78]

During the interview, Bea Taylor recounted her observations of the day of Linda Jo Edwards's murder. Bea Taylor was an immediate neighbor of Paula Rudolph and an assistant apartment manager for the complex. Notable among her observations, Taylor stated:

- She saw Mayfield's car parked in the apartment complex on the afternoon of the murder.

---

[78] Although the interview was transcribed on April 5, 2016, it is unclear when the interview actually took place.

- Between 7:30 to 7:45pm on the night of the murder, Bea Taylor was watering the yard in her backyard area and noticed Paula Rudolph's patio door was unlocked and open 6-8 inches, and Linda's bedroom window drapes drawn.[79]

- Immediately following the discovery of the body and the arrival of the police, Paula Rudolph entered Taylor's home next door to use the phone and wait until police were finished investigating Rudolph's apartment. During that time, Paula made the following statement: "They're going to take me down for a statement, but I'm not telling the police anything."[80]

*Affidavit of [FBI Supervisory Special Agent] Gregg McCrary (June 27, 2016).*

As an FBI Academy Supervisory Special Agent at the Behavioral Science Unit, McCrary reviewed Special Agent Gomez's testimony for accuracy. (In a separate affidavit, Special Agent Gomez stated that he had consulted with Supervisory Special Agent McCrary since he was "much more experienced" in the investigation of lust murders.) In addition to attaching a corrective FBI Law Enforcement Bulletin article on lust murderers, McCrary made the following three points regarding Gomez's conclusions:

1. Special Agent Gomez's misrepresented that homosexual or bisexual activity is common in lust murders, and that this kind of activity fit the killer's profile against a female victim.[81]

2. "Mr. Gomez also states in his affidavit that he was relying on his experience with the LAPD where he was 'aware of' homosexual and bisexual men committing lust

---

[79] (KMC 8881-82).

[80] (KMC 8886).

[81] (KMC 9311).

murders on females who were unknown to them, and providing training on those cases. To my knowledge, there are no such cases."[82]

3. Finally, McCrary asserted that Gomez's conclusions (classifying the crime as a true lust murder and not another type of homicide) were pure speculations at best: "In other words, [Gomez] testified that he had made a threshold diagnosis based on nothing more than looking at a few photographs. He had not reviewed the entire file, was unaware of victimology and all other data necessary to properly classify a homicide."[83]

**Cook's Current Habeas Application and Settlement Agreement**

On September 14, 2015, Cook filed the Article 11.07 application for a writ of habeas corpus that is currently pending before this Court. Cook raises five claims for relief. In Grounds One and Two, Cook asserts that the new DNA evidence, when viewed in the context of the record as a whole, shows that he is actually innocent and that his conviction should be vacated. In Ground Three, Cook claims that the State, in bad faith, withheld knowledge of the exculpatory nature of the DNA evidence prior to Cook entering into his no-contest plea. In Ground Four, Cook claims that the State, in bad faith and without notice to him, destroyed biological evidence (the hair with a bloody root) before it could be tested. In Ground Five, Cook claims that his due process rights were violated based upon the false testimony of James Mayfield.

After Mayfield's 2016 interview, the parties entered into a "Stipulation and Settlement Agreement." The parties stipulated and agreed that Cook is entitled to relief

---

[82] *Id*.

[83] (KMC 9312).

43

pursuant to his fifth ground for review—that his due process rights were violated by the false testimony of Mayfield. The parties also stipulated that Cook's actual innocence claim raised in Ground One would be submitted without any agreement by the parties. However, the State took the position of remaining silent on actual innocence in a subsequent motion hearing.[84] In both the stipulation agreement and the hearing, the parties agreed that, if this Court granted relief on either of those two grounds, all other grounds would be dismissed. The trial court held a hearing on July 1, 2016, to hear arguments.

### *The Trial Court's Findings, Conclusions, and Recommendation*

On August 16, 2016, the trial court entered its findings and conclusions and recommended that relief be granted based on Cook's false testimony claim (Ground Five), but that relief be denied on Cook's claim on actual innocence (Ground One). The trial court made the following findings of fact from all of the newly discovered evidence:[85]

- 13. On the day before the murder, James Mayfield visited the apartment of Linda Jo Edwards and had sexual intercourse with her.

- 16. [Paula] Rudolph thought or assumed the man [she saw in their apartment] was James Mayfield. [In her original report to police,] she described the man as a tan Caucasian wearing white shorts with a sleek and slender figure and silver hair in a medium cut touching his ears. [*It is important to note that, at the time of the murder, Cook's hair was shoulder-length and dark.*]

- 17. At that time James Mayfield was tanned, had silvery hair, and played a lot of tennis.

---

[84] Stipulation and Settlement Agreement on App. for Writ of Hab. Corp., at *5 (June 6, 2016); (2017-09-26 1 RR 1-11) ("Motion Hearing").
[85] The paragraphs are numbered as they are in the document containing the trial court's finding of fact.

- 24. In 1999, two months after the plea of no contest was entered by Cook, the DNA test results showed that James Mayfield was the depositor of semen on the panties worn by Linda Jo Edwards on the night of her murder.

- 25. The same DNA tests excluded Cook as the depositor of semen on [Linda Jo] Edwards's panties.

- 26. After the DNA testing statute was enacted in Texas, Cook requested additional DNA testing.

- 27. Tests were done on several articles taken from [Linda Jo] Edwards's apartment and none were linked to Cook.

- 28. The later tests again revealed James Mayfield's DNA on [Linda Jo] Edwards's panties.

- 29. Until April 2016, James Mayfield testified that he had not engaged in sexual relations with Linda Edwards for a three week period prior to her death.

- 30. Mayfield specifically denied having sexual relations with [Linda Jo] Edwards on the day before she was murdered.

- 31. In April 2016, in an interview with all counsel, Mayfield readily admitted having sexual relations with [Linda Jo] Edwards the day before the murder.

- 32. James Mayfield lied under oath at the previous Cook trials.

- 33. A book entitled *The Sexual Criminal* was in the university library.

- 34. The book showed in graphic detail the result of many gruesome murders some of which included pictures similar to some of the pictures from the [Linda Jo] Edwards murder scene.

- 35. In April 2016, Mayfield admitted that he had seen the book and that a colleague showed him the book and was concerned that it was in the university library.

- 36. A police report in one instance stated that Paula Rudolph said that the man she saw in [Linda Jo] Edwards's room was Mayfield.

With regard to Cook's claim of actual innocence, the trial court made the following conclusions of law:

45

- 10. The court finds that Cook's new exculpatory evidence does not affirmatively prove his innocence.

- 11. The court finds that while the DNA evidence would be helpful in attempting to persuade a jury that it is likely that Mayfield, the depositor of the semen, was the last person to see Linda Edwards alive, the evidence does not necessarily lead to that conclusion or affirmatively prove that Cook is innocent.

- 12. It is not logically irreconcilable that Cook could have committed the murder even though Mayfield very recently engaged in sexual activity with [Linda Jo] Edwards.

- 14. It does not necessarily follow that Mayfield's lie about the last time he had sex with [Linda Jo] Edwards provides affirmative proof that Cook is innocent of the murder.

- 15. The fact that Mayfield lied about never having seen the book entitled "The Sexual Criminal" does not provide affirmative proof of Cook's innocence.

- 16. The police report of [Paula] Rudolph's statement that "the man she saw was Mr. Mayfield" is inconsistent with her testimony in court. It could provide a basis to attack the [Paula] Rudolph identification, and is some evidence of Cook's innocence.

- 17. Considering all of Cook's new exculpatory evidence the court finds that it does not unquestionably establish Cook's innocence.

- 18. The State presented evidence at the previous trials of Cook's guilt. The court finds the most persuasive evidence to be the fingerprints of Cook found inside the [Linda Jo] Edwards apartment, the Paula Rudolph identification testimony, and the Robert Wickham testimony of Cook's admission.

- 19. The fingerprint evidence places Cook inside the apartment. It cannot be determined with certainty when the print was made, but the evidence remains that he was there at some time.

- 22. Overall when the new exculpatory evidence is analyzed together with the inculpatory evidence this court finds that the evidence is not rationally irreconcilable.

- 23. The court finds that a reasonable juror could, based on all evidence now before the court, rationally find the defendant guilty.

- 24. The court finds that Cook has not clearly, convincingly, and unquestionably established his innocence of this crime.

Both sides agree that the record supports the trial court's finding of fact. Both sides agree to the recommendation that Cook is entitled to relief on Ground Five—his due process claim based on Mayfield's false testimony. Although they opposed actual innocence in a stipulation agreement, the State subsequently took the position of remaining silent in a motions hearing by leaving it up to the Court.[86] Today, we grant Cook relief on actual innocence. Because we grant relief on his claim of actual innocence, we need not address his remaining due process claims.

**The Many Delays**

The road to this point has been long—much of it unnecessarily so. As summarized above, the case has been plagued with mistrials, withheld evidence, and misconduct. Even within just this application for writ of habeas corpus, this case has been the victim of repeated delays to obtain the extremely voluminous record which included three full capital murder trials, writ hearings, and a plea agreement. Until this Court received the *entire* record, a complete review was not possible.

As mentioned above, Cook filed his application for writ of habeas corpus on September 14, 2015. On April 25, 2016, the habeas trial court was granted an extension to complete its resolution of Cook's application for writ. It was completed and received by

---

[86] Stipulation and Settlement Agreement on App. for Writ of Hab. Corp., at *5 (June 6, 2016); (2017-09-26 1 RR 1-11) ("Motion Hearing").

this Court on August 25, 2016. However, Smith County failed to transmit the full record. Numerous informal requests and phone calls between this Court's staff and Smith County resulted in this Court receiving part of the record on September 20, 2017. On February 4, 2019, additional supplemental materials were forwarded to the Court from Smith County. However, the record was still incomplete.

On May 20, 2019, this Court ordered Smith County to send the remaining missing parts of the record, specifically listing out the missing items. But Smith County failed to timely respond with the missing items. During this time, the COVID-19 crisis and statewide court system ransomware attack occurred and delayed resolution of the problem even further. Applicant also replaced his lead counsel twice, most recently as of March of 2021.

On May 10, 2022, Applicant filed a motion, *inter alia*, asking this Court to order Smith County to comply with the May 20, 2019 order with the specified list of items. This Court issued the requested order on September 1, 2022. On September 21, 2022, this Court finally received the requested files from Smith County along with a document titled "State's Summary of the Record of the Convicting Court." Applicant responded with a reply to the State's summary on October 28, 2022.

Finally, after reviewing *all* the records, this Court brings this case to its resolution.

**PART IV**

**Actual Innocence – *Herrera* Claims[87]**

"Establishing a bare claim of actual innocence is a Herculean task" under a *Herrera* type claim.[88] This is because the habeas applicant is challenging what is presumed to be an error-free trial "with the full panoply of protections that our Constitution affords criminal defendants."[89] "A conviction that results from a constitutionally error-free trial is entitled to the greatest respect."[90] Thus, under a *Herrera* claim of actual innocence, we require *newly discovered evidence* that "was not known to the applicant at the time of trial and could not be known to him even with the exercise of reasonable due diligence."[91] Thus, applicant must first show that the evidence he is presenting is "newly discovered" and then show it is affirmative evidence towards his innocence.[92]

---

[87] Cook's claim of actual innocence contains attributes common to *Schlup* type cases due to the many instances of misconduct and *Brady* violations. *See Schlup v. Delo*, 513 U.S. 298, 314 (1995) (finding actual innocence is possible in a "narrow class of cases" where a defendant is denied the "full panoply of protections afforded to criminal defendants by the Constitution" thereby "implicating a fundamental miscarriage of justice").

[88] *Ex parte Brown*, 205 S.W.3d 538, 545 (Tex. Crim. App. 2006). This burden borne by Applicant is supposed to be "Herculean"—not impossibly "Sisyphean" in difficulty.

[89] *Ex parte Elizondo*, 947 S.W.2d 202, 208 (Tex. Crim. App. 1996); *Herrera v. Collins*, 506 U.S. 390, 419 (1993) (O'Connor, J. concurring).

[90] *Ex parte Franklin*, 72 S.W.3d 671, 677–78 (Tex. Crim. App. 2002). "Thus, in the eyes of the law, [the applicant] does not come before the Court as one who is 'innocent,' but, on the contrary, as one who has been convicted by due process of law . . . ." *Herrera v. Collins*, 506 U.S. 390, 400 (1993).

[91] *Brown*, 205 S.W.3d at 545.

[92] *Ex parte Miles*, 359 S.W.3d 647, 671 (Tex. Crim. App. 2012).

Under the great weight of this standard, post-conviction relief will only be granted when the applicant establishes "by clear and convincing evidence that, despite the evidence of guilt that supports the conviction, *no reasonable juror* could have found the applicant guilty in light of the new evidence."[93] The applicant "must do more than merely raise doubts about his guilt—he must produce 'affirmative evidence' of innocence."[94] We must therefore analyze "the probable impact of the newly available evidence upon the persuasiveness of the State's case *as a whole*, . . . we must necessarily weigh such exculpatory evidence against the evidence of guilt adduced at trial."[95] Relief is warranted when "the *totality* of the new evidence of innocence unquestionably establishes that a jury would not have found the defendant guilty in light of the new evidence when weighed against the old evidence establishing guilt."[96]

**Weaknesses in the State's Case Revealed**

---

[93] *Brown*, 205 S.W.3d at 545 (emphasis added). This is not to be confused with the deferential sufficiency-of-the-evidence standard. Under a sufficiency review, the Court must look at the evidence "in a light most favorable to the verdict." *Elizondo*, 947 S.W.2d at 206. Moreover, unlike actual innocence cases, inculpatory evidence cannot be weighed against the exculpatory evidence. *Id*. Under a sufficiency review, "when the record supports conflicting inferences, we presume that the jury resolved the conflicts in favor of the verdict, and we defer to that determination." *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex. Crim. App. 2014). However, in an actual innocence analysis, "our job is not to review the jury's verdict, but to decide whether the newly discovered evidence would have convinced the jury of applicant's innocence." *Ex parte Mayhugh*, 512 S.W.3d 285, 298 (Tex. Crim. App. 2016) (plurality opinion).

[94] *Ex parte Reed*, No. WR-50,961-10, 2023 WL 4228290 (Tex. Crim. App. June 28, 2023).

[95] *Ex parte Miles*, 359 S.W.3d 647, 671 (Tex. Crim. App. 2012) (emphasis added).

[96] *Ex parte Mayhugh*, 512 S.W.3d 285, 296 (Tex. Crim. App. 2016) (plurality opinion) (emphasis added).

The evidence supporting the State's case is only sufficient if the reviewer picks and chooses the evidence to consider and ignores everything inconvenient to the desired outcome. But as stated above, this is not a sufficiency of the evidence review. In this review, we cannot ignore evidence inconvenient to guilt. Here, we must consider the new evidence affirmatively tending towards innocence in the context of all of the already-existing evidence.

With these principles in mind and when viewing the body of evidence in its totality, the State resorted to improper means to achieve conviction. The timeline of events provided by the State is practically impossible. The State's key identification witness is completely unreliable because she is inconsistent with her own testimony and her initial descriptions. Moreover, her testimony actually favors the defense theory that it was domestic homicide more than not. The fingerprint expert, at the State's behest, made false representations to the jury. And in doing so, he indirectly supported evidence contrary to Cook's guilt. The State's criminal profile of the killer, as derived from the FBI's criminal classification manual, does not match Cook and is inconsistent with itself. And the alleged confession given to Bob Wickham reported 13 years later contains claims that are highly implausible. In terms of physical evidence, the State inexplicably and selectively destroyed an exculpatory human hair with a bloody root that could have come from the true killer. Meanwhile, in support of the domestic homicide theory, Mayfield's semen was found on Linda's underwear. Mayfield, after decades, also finally admitted under a grant of immunity that he had lied under oath about restarting an illicit sexual relationship with

51

Linda shortly before her murder that threatened his marriage. And on top of all this, Mayfield finally admitted his knowledge and possession of a book which very well could have served as an instruction manual for a psychotic killing.

### *Problems with the Timeline*

When all the testimony of the State's witnesses are put together, the resulting timeline is extremely problematic for the State. While it does not make it *physically impossible* for Cook to be the murderer, *even when the State's timeline is given every benefit of the doubt*, it is highly improbable that Cook could have accomplished such a gruesomely sophisticated murder within the State's timeframe. Beginning with the early evening of June 9, 1977, and into the morning of the next day, we know the following:

| | |
|---|---|
| 5:00 pm | Paula Rudolph got off work and went directly to the stables to ride her horse.[97] |
| 8:00 pm | Paula left the stables and arrived home around 8:30pm.[98] She prepared some food and watched TV.[99] |
| 9:00 pm | Paula began watching the "Barnaby Jones" which started at 9:00 pm in the den (Linda Jo Edward's room). Shortly into the show, a friend called Paula asking her out for |

---

[97] (I Tr. 3 RR 466).

[98] According to a never-before-disclosed interview, Bea Taylor was watering her back yard area around 7:30-7:45 pm and noticed that Paula Rudolph's patio door was unlocked and <u>open</u> about 6-8 inches. She agrees that it is very likely that it remained unlocked and open till midnight. (KMC 8881-82, 8891-92). According to Bea Taylor, moreover, Paula arrived home around 9:20-9:30 pm and not 8:30 pm. (KMC 8888, 8909).

[99] (I Tr. 3 RR 466).

drinks. After some back and forth, Paula agreed to meet him around 10:30 pm.[100]

9:15-9:30 pm    As she finished eating dinner, Linda Jo Edwards arrived home. Linda was in a celebratory state because she had just gotten a new job. Paula chatted with her for a few minutes before washing her hair. Afterwards, she continued chatting with Linda while eating fruit together.[101]

10:00 pm    *Robert Hoehn received a call from Kerry Max Cook a little after 10:00 pm. While on the phone, Cook asked Hoehn to bring beer.[102]*

10:30 pm    Paula left the apartment to meet her friend for drinks. She did not lock the front door when she left.[103] She never saw Linda Jo Edwards alive again.[104]

10:35-10:45 pm    *Hoehn arrived at James Taylor's apartment where Cook was staying. The apartment was in a different building but still part of the Embarcadero Apartment complex. "The Sailor Who Fell from the Grace of the Sea" was playing*

---

[100] (I Tr. 3 RR 467). According to Alma Padron, Alma encountered Linda at the apartment complex tennis court "in the 9:00 [pm] vicinity." (III Tr. 28 RR 2182). Alma spoke with Linda for about 20-30 minutes before inviting Linda to their apartment for drinks with her, her husband, and another friend. (III Tr. 28 RR 2183). While at her apartment, Alma remembered Linda being "uneasy" and needing to go home to talk to her roommate before she left at 10:30 pm. (III Tr. 28 RR 2184, 2189). Bea Taylor, in her interview, corroborated that Linda was observed (by one of the neighbors) returning home from having drinks with the Padrons at around 10:30 pm through the front door. (KMC 8891).

[101] (I Tr. 3 RR 467-71).

[102] (I Tr. 4 RR 638).

[103] Paula testified that she did not lock the door as she left. Furthermore, it is very possible that Linda Jo Edwards left the door unlocked as she was often criticized for leaving the doors unlocked and not closing her curtains all the way.

In his report dated June 28, 1977, Texas Ranger Stuart Dowell wrote, "By her own admission, Miss Rudolph had left the front door unlocked when she left." (KMC 1295). Ranger Dowell concluded that the assailant entered through the front unlocked door. (KMC 1295).

[104] (I Tr. 3 RR 471, 476, 479-80).

*on TV when he arrived. Hoehn was able to identify a specific scene that was playing when he arrived.*[105]

*Five minutes after arriving, Cook suggested that they both go to the pool. While enroute, Cook pointed out a bedroom window where he knew a "good looking chick" lived. Cook and Hoehn ended up spending 20-25 minutes at the pool before heading back to the apartment. Once they got back, they resumed drinking beer and watching the movie.*[106]

11:45 pm          *The movie on TV ended. Cook asked Hoehn to go out to buy cigarettes together.*[107]

12:00-12:05 am   *Cook and Hoehn left the apartment to go buy cigarettes in Hoehn's car. They drove to a Kroger located on S. Broadway which was approximately 8 miles away and drove roughly the speed limit (45 mph) there and back. They spent at least a few minutes in the store while waiting on the store clerk to retrieve cigarettes. Afterwards, Cook asked Hoehn if he wanted to go riding instead of going back. Hoehn declined because he had an early morning the next day.*[108]

12:30-12:45 am   Paula Rudolph returned home sometime between 12:30-12:45.[109] When she opened the front door, it was still unlocked. As she entered the entryway, she saw a male

---

[105] (I Tr. 4 RR 638-39, 640, 646, 666).

[106] (I Tr. 4 RR 648-49, 668, 671-78).

[107] (I Tr. 4 RR 650-52, 707).

[108] (I Tr. 4 RR 650, 713-14).

[109] Paula Rudolph testified in further detail in the second and third trials about having drinks with a male friend visiting from Lufkin. (III Tr. 23 RR 964-65). She met him at a Holiday Inn in the southeast quadrant of Tyler—roughly 20 minutes away via the speed limit—and had drinks at a bar there. (III Tr. 23 RR 965). Because alcohol sales ceased at midnight, she left the area "shortly after midnight" per her testimony in the 2nd trial. (III Tr. 23 RR 967, 1076). However, by the third trial, she estimated that she left around 12:15 to 12:20 am. (III Tr. 23 RR 967). She estimated that it took her about 15 minutes to return home because there was no traffic and she was "driving pretty fast." (III Tr. 23 RR 968). This would have placed her arriving at home between 12:30 and 12:35 am—giving Cook only minutes to accomplish what he is accused of doing.

54

"figure" inside the den (Edward's bedroom) near the doorway "turn" or "whirl." Simultaneously, she said, "Don't worry, it's only me" and went straight to her room on the opposite side of the living room. Upon arriving, she smoked a cigarette. Moments later, she heard the patio sliding door open and close. After preparing for bed, she read for a few minutes before going to sleep.[110]

*On their return trip from Kroger, Hoehn travelled on S. Broadway, turned on Grand A, and then turned again on Old Bullard Rd. Hoehn testified that he dropped Cook off at 12:30, maybe 12:35, but definitely before 12:45 am. Specifically, he dropped Cook off at the entrance to the front parking lot in front of the entire apartment complex off Old Bullard Rd—the opposite side of the complex from Linda Jo Edward's and Paula Rudolph's apartment.[111]*

12:50 am      Paula Rudolph, after reading for a few minutes, set her alarm clock and then went to sleep at 12:50 am. She did not hear any sounds or disturbances during the night.[112]

7:00 am      Shortly before 7:00, Paula woke up and began making coffee. After calling out to Linda Jo several times, she discovered her body in the den (Linda's bedroom) and called an ambulance.[113]

11:30 am      Dr. Gonzalez, a pathologist, began examining the body at the request of Tyler PD. Already detecting rigor mortis, he placed the estimated time of death between 10-12 hours prior (a time span surrounding midnight).[114]

---

[110] (I Tr. 4 RR 476-83, 488-89, 490-92, 503, 506).

[111] (I Tr. 4 RR 650, 706, 713-14); *see also* (I Tr. St. Exh. 107).

[112] (I Tr. 3 RR 491-92).

[113] (I Tr. 4 RR 492-95).

[114] (I Tr. 5 RR 869).

Under this timeline—which the State has consistently put forth since the first trial—and giving the State every benefit of the doubt, Cook would have had a an extremely short window of time to commit the grisly murder of Linda. From the 15 minutes of *possible* overlap between Cook being dropped off and Paula Rudolph seeing the whirling figure, Cook would literally have had to hit the ground running. Moving from where he was dropped off to Linda's apartment, even at a full run, would have likely taken several minutes. Thus, Cook had a *maximum* of roughly 12 minutes (and probably much shorter than that) to enter the home without any foreknowledge that Linda was alone inside with both doors unlocked, viciously inflict numerous wounds against Linda[115] via multiple weapons normally found in different rooms, and then extensively mutilate her body.

The State's confidence that Cook committed a sophisticated *disorganized* lust murder[116] in the space of 12 minutes (and likely shorter time) contradicts itself. First, it would have required a high efficiency of movement that most likely required premeditated planning and/or prior experience. These requirements are something a disorganized lust murder specifically excludes and something Cook has no known history of. Second, this

---

[115] The pathologist who examined the body recorded somewhere between 20-30 stab wounds over the entire body and at least 10 blows to the head. (5 RR 873, 879). The pathologist as well as Sgt. Heskew acknowledged that many of these wounds were difficult to inflict unless the body was physically held in certain positions due to difficult angles and the need to use strength. (I Tr. 5 RR 877; III Tr. 22 RR 709-12).

[116] *See infra* note 191 and accompanying text. After reviewing the crime scene evidence, State experts identified the murderer as a disorganized lust murderer based on the FBI Crime Classification Manual which compares characteristics of similar crimes, criminals, and their corresponding criminal motivations from all over the country. This profile (and corresponding crime classification) will be discussed in a later section.

theory is inconsistent with the testimony of the State's experts. After observing photos and reports of the crime scene and victim's body, FBI Special Agent David Gomez, an expert crime analyst and profiler, stated that the killer had a "considerable amount of time spent with this victim."[117]

Sgt. David Heskew, an Austin Police Department detective consulting in this case, testified that the extreme number of stab wounds and postmortem carving were not signs of "overkill," but experimentation—the killer was sadistically "playing" with the victim's body.[118] Sgt. Heskew also testified that many of the wounds would have required the killer to move and hold the body in various positions in order to inflict them. This would not have been easy. Bloodstain evidence indicates that the victim's lower body was up and bent over when numerous "toying" postmortem cuts were made.[119] The killer had the left leg of the body elevated by holding the left hip with one hand while the other made upward cuts.[120] Furthermore, Dr. Gonzalez, the pathologist who examined the body, testified that the nature of the wounds indicated that the mutilations took a longer time to inflict due to the need to use strength.[121] Thus, though it strains the limits of what is physically possible,

---

[117] (III Tr. 22 RR 833).

[118] (III Tr. 22 RR 677).

[119] (III Tr. 22 RR 709-10).

[120] (III Tr. 22 RR 710-12).

[121] (III Tr. 5 RR 877).

it is *practically* impossible for Cook to have committed these heinous acts within a maximum 12-minute (but likely much shorter) time frame.

### *Inconsistencies with Cook, Mayfield, and Paula Rudolph's "figure"*
*Line of Sight and Visibility Issues*

It is undisputed that the "figure" Paula Rudolph encountered as she returned home in the very early hours of June 10, 1977, is very likely the killer. However, what Paula claims she saw that morning is problematic for several reasons. First, Paula's ability to see the figure was disadvantaged by her circumstances. The layout of the apartment would have given her almost no line of sight into Linda's room from the entrance hallway.[122] Thus, Paula's field of vision—especially as she claims she never stopped moving forward—was extremely limited.[123] She only saw the male figure for an instant who immediately moved out of her field of vision and closed the door to the room.[124] Paula testified that she found the moment awkward and headed straight to her room.[125] She further admitted under cross-examination that she was trying to look away and not see what was going on *because* of the awkwardness.[126] And to add to the challenging circumstances,

---

[122] *See* (I Tr. Def. Exh. 4) (depicting the floor plan to Paula Rudolph's apartment unit).

[123] (I Tr. 3 RR 482).

[124] (I Tr. 3 RR 483, 508; III Tr. 1056-57).

[125] (III Tr. 23 RR 975).

[126] (I Tr. 3 RR 506).

she had been in a series of dark environments suddenly looking into an intensely bright room.[127] The collective effect of these circumstances is unfavorable to Paula's ability to see the figure clearly enough to positively identify him.

### *From "I didn't see any facial features" to positive identification*

Second, Paula's description of the figure is also problematic because it changed over time. In her sworn statement made to police on June 10, 1977, Paula gave the following description of the figure:

> silver hair cut in a medium touching the ear fashion that men wear. The body was that of a Caucasian with a tan wearing white shorts of some fashion. I do not know if they were briefs, walking shorts, tennis shorts or exactly what style. The figure was sleek and slender.[128]

Furthermore, Paula explicitly stated that she did not see the figure's "facial features" in her brief glimpse, but only a silhouette or "shadow."[129] In August of 1977, testifying for the very first time, Paula testified consistently with her police statement at a pretrial court hearing.[130] Although Cook was present in the courtroom with his lawyers, she did not identify him as the person she encountered that night.[131] On September 19, 1977, Paula

---

[127] (I Tr. 3 RR 485). The "halo" effect will be further discussed below.

[128] (I Tr. 3RR 510-11); *see also* (KMC 1098) (stating in the police report by Officer Eddie Clark on June 13, 1977, that Paula "thought it was Linda's boyfriend and continued on to her bedroom").

[129] (I Tr. 3 RR 552); *see also* (III Tr. 23 RR 1073).

[130] (III Tr. 23 RR 1068-69).

[131] Paula responded to her apparent inability to recognize Cook at this hearing by claiming she was never asked to identify Cook. (III Tr. 23 RR 1068).

testified again before the grand jury and provided them with her description of the male figure.[132] Although Cook was not present, she again did not identify Cook as the person she saw the night of the murder.[133] The very next day, she testified again in Cook's writ of habeas corpus hearing. During the hearing and with Cook again in the courtroom, she adamantly testified that she could not identify the figure positively: "I will not swear under oath who it was."[134]

However, while on break during that hearing, Paula testified that she and her sister-in-law went to the courthouse basement to purchase a coke. Riding the elevator back up, Paula underwent a traumatic flashback experience of some kind that would forever associate Cook's face with the figure she previously could not identify:

> Since we were – you know, it was early in the morning, everybody coming and going, and we moved to the back of the elevator. It stopped at each floor and people got on and off.
>
> When we got to the basement, the doors opened and people got off that were standing in front of us. At that time, there w[ere] three people standing in front of the elevator. One of them was the person I had seen in Linda's apartment that night; he [Cook] was standing as the doors opened, it was – there was a light behind, it was almost like a flashback. I mean it was just – I gripped [my sister-in-law's] hand, her arm. I was in the corner. I gripped her arm with one hand and squeezed so hard, I left bruises on it.

---

[132] (III Tr. 23 RR 1069).

[133] *Id.*

[134] (III Tr. 23 RR 1093).

60

One patrolman asked her if we were getting off and she said, no. And they got on the elevator and I just – I just stood there holding her arm on the other side of the elevator.[135]

Thereafter, even though she claims never saw any "facial features," she positively identified Cook as the person she briefly glimpsed in Linda's room in all subsequent testimony.

Following this dramatic change, the State did neither themselves nor Paula Rudolph any favors in preventing the possibility of further misidentification.[136] During the summer of 1992, prior to the second trial (the trial that ended in mistrial in part due to other prosecutorial bungles), an assistant district attorney and a Tyler PD detective visited Paula in her new home in Huntsville and suggestively laid two photographs on the table where

---

[135] (III Tr. 23 RR 1010-11).

[136] The State's case is full of examples of adjusting, minimizing, or ignoring inconvenient facts in relation to their fixated theory that Cook must have committed the offense. Because they pursued their case with absolute certainty instead of at least entertaining a healthy amount of doubt, there are many gaping holes in the evidentiary record that might have otherwise been discoverable.

she could see them. One of them was a profile picture of Cook.[137] Prior to that point, Paula

had never been shown Cook's photo nor reviewed a lineup of any kind.[138]

---

[137] In *Ibarra v. State*, this Court outlined a test for identifying impermissible suggestive identification procedures. Although not directly on point, it is informative as applied to the State:

> The following five non-exclusive factors should be "weighted against the corrupting effect of any suggestive identification procedure in assessing reliability under the totality of the circumstances:"
>
> (1) the opportunity of the witness to view the criminal at the time of the crime;
>
> (2) the witness' degree of attention;
>
> (3) the accuracy of the witness' prior description of the criminal;
>
> (4) the level of certainty demonstrated by the witness at the confrontation, and
>
> (5) the length of time between the crime and the confrontation.

*Ibarra v. State*, 11 S.W.3d 189, 195 (Tex. Crim. App. 1999). Paula's glimpse of the murderer was very brief and self-admittedly inattentive. Paula's certainty in her identification of Cook was also shifting from adamant inability to identify if it was Cook to absolute certainty that it was him over time. Paula also described the murderer as having hair "cut in a medium touching the ear fashion that men wear." As discussed further in a later section, in 1977, Cook had dark shoulder-length hair. *See* St. Exh. 218 (depicting Cook with shoulder-length hair). However, leading up to the second trial more than a decade later, an assistant district attorney and a Tyler PD detective suggestively showed Paula a more recent photograph of Cook (St. Exh. 163) with a haircut where *his hair came down only to his ears*. This was out of two photographs shown to Paula presumably to solidify her ability to identify Cook at trial. It is unclear from the record who the subject of the other photograph was.

This is consistent with the 2016 affidavit of Dr. Jennifer E. Dysart, a tenured professor of psychology at John Jay College of Criminal Justice of the City University of New York. A renowned expert on eyewitness identification who has testified more than 60 times, Dr. Dysart opined that Paula's positive identification of Cook "may have been honestly but wholly mistaken" because of the "numerous, proven risk factors common in cases of eyewitness misidentification." Aff. Jennifer E. Dysart, at *8 (May 29, 2016).

> (1) Paula self-admittedly relied on "body only" identification (she repeatedly denied seeing the facial features) which carries a 4x greater risk of misidentification than normal in part because of the lack of particularized information observed by the witness. The risk of "body only" misidentification may have been particularly heightened in Cook's case because Paula only saw Cook standing still in the elevator rather than seeing his gait—another feature that is potentially recognizable. *Id*. at *9-10.
>
> (2) Paula may have experienced "source confusion"—a phenomenon that occurs when a "witness mistakenly identifies a familiar face as the perpetrator of a

*The "halo" effect*

The State, instead of questioning Paula's testimonial conversion, utilized another result-oriented method following the first trial to make the evidence fit their theory. The State hired Allen Weckerling, an accident reconstruction and failure analyst, to determine

---

crime." According to Dr. Dysart, this can occur when the witness sees the suspect in an innocent setting but transfers the face in her memory to the perpetrator's. Here, Paula, though unable to identify Cook after seeing him in court twice, knew that (1) police and prosecutors believed they had enough to charge Cook with capital murder; and (2) "had, by consequence 'ruled out' the other man [Mayfield]." "In other words, these circumstances create[d] a high risk of (unconscious) suggestion that [could] taint a witness's memory." Dr. Dysart noted that this risk would have been heightened because Paula's identification took place three months after she saw the killer. *Id*. at *10-11.

> [T]he fact that Ms. [Paula] Rudolph suddenly "recognized" Mr. Cook in a public courthouse elevator, only after seeing him twice as a charged capital murder defendant in another room of the same courthouse, indicates her memory may well have been unconsciously contaminated by those prior sightings.

*Id*. at *12.

(3) The description given to Police contain a "significant" amount of "description mismatch" with Cook. The inaccurate descriptors included Cook's hair color, hair style, and the clothes he was wearing. In a study of hundreds of DNA-based exoneration cases, substantial description mismatch was found to be correlated to witness misidentification. *Id*. at *13.

Dr. Dysart further noted:

> That [Paula] was never asked to view or identify Mr. Cook under controlled conditions before testifying seems to indicate that she did not waiver from her initial identification of Mr. Mayfield (or, at the very least, the descriptors she provided that were consistent with him), even after she "calmed down" in the days and weeks following her discovery of the victim's body . . . . Indeed, her conduct immediately following the sighting indicates a high degree of confidence in that contemporaneous identification (the time when a victim's confidence in her identification correlates most strongly with its accuracy).

*Id*. at *16.

[138] (III Tr. 23 RR 1013-14, 1024, 1026-28).

63

how Cook's "jet black" hair might appear to be silver as the result of a "halo" effect.[139]

Weckerling identified several factors that could contribute to an increased "halo" effect including: the position of the light source in relation to the "figure."[140] According to Weckerling, positioning the light source (two 100-watt bulbs) to be more directly behind the subject (from the viewer's perspective) would increase the "halo" effect—along with a silhouette—thus, allowing for dark hair to appear silver-ish.[141] By the time of the third trial, Paula's description of the figure explicitly incorporated the "halo" effect though this effect was not mentioned the first four times she testified:[142] "It gave the appearance with the light, it shined silver, you know, and gave the appearance almost of a halo around the hair, as it – around the head."[143]

The "halo" effect, however, is a double-edged sword that cuts against the State's theory much more than it helps it. As implicitly acknowledged by Weckerling (and as a matter of common sense), a stronger halo comes at the expense of a more pronounced silhouette. And if the silhouette is more pronounced, less light reaches the facial features—

---

[139] (III Tr. 23 RR 1126-28). Paula Rudolph, in her June 10, 1977 statement to the police, expressly stated that the figure's hair was "silver"—not "silver-ish" nor "silver as the result of a halo." (I Tr. 3 RR 510-11); *see* St. Exh. 218 (showing Cook to have jet black hair).

[140] (III Tr. 23 RR 1137). The other two factors included whether the hair was fluffy; and whether the hair was wet or greasy. However, as Paula Rudolph testified that she saw a silhouette who was standing in front of the light fixture, the first factor is more likely to have been the dominant factor under the State's theory. (I Tr. 3 RR 507, 552); *see also* (III Tr. 23 RR 1073).

[141] (III Tr. 23 RR 1137).

[142] The 1st trial was the fourth time Paula Rudolph had testified under oath. As discussed earlier, Paula had already testified under oath in pretrial hearings.

[143] (III Tr. 23 RR 986).

especially where the light source is moved further *behind* the subject—rendering the face increasingly less visible.[144] In contrast, moving the light increasingly forward would diminish the halo effect, but increase the visibility of the facial features.

The State's theory undermines Paula's identification of Cook because the theory cannot have it both ways. It is undisputed that in 1977, Cook had "very black" hair with no speckles of gray or white.[145] Thus, for Paula to have mistaken "very black" hair as silver would have required a very strong halo effect. Assuming *arguendo* that Cook was the figure Paula saw, this "silver hair halo" scenario would have rendered his facial features far closer to unidentifiable than not. Alternatively, making Cook's facial features more identifiable would have left his hair unmistakably black in color. Since the first "silver hair halo" scenario is far more consistent with Paula's initial description (assuming a halo effect was actually a factor), it is far more likely that she misidentified Cook as the figure she briefly glimpsed as she rushed to her room.[146]

### *Other Inconsistencies Between the "figure" and Cook*

---

[144] *See* (III Tr. 23 RR 1137).

[145] (I Tr. 3 RR 518).

[146] (I Tr. 3 RR 483, 506, 508; III Tr. 1056-57). To reiterate, on the morning the body was discovered, Paula Rudolph told police that the figure she saw had "silver hair." (I Tr. 3 RR 510-11). In her official statement, she denied ever being able to see "facial features" and all she saw were "shadows" or a silhouette. (I Tr. 3 RR 552).

65

The State's theory that Cook is the killer does not fit with other aspects of Paula Rudolph's testimony.[147] These mismatching details, especially in the context of the rest of the evidence, tends to disprove Cook as the figure Paula saw. The first mismatch is the figure's clothing. During the first trial in 1978, Paula Rudolph described the figure as a sleek, slender, tanned Caucasian male wearing "white shorts of some fashion."[148] During the second trial in 1992, she described the figure as a "very sleek but broad shouldered" male with "hair [that] looked silver."[149] According to Paula, he was a "shirtless man" wearing "white shorts"—"a pair of underwear trunks or swim shorts."[150] During the third trial, Paula again described a slim shirtless male figure with a "very golden tan" wearing "white shorts."[151] However, though he was tanned, Cook was last seen (minutes before the State's theory of the murder took place) wearing a pair of red and blue boxer shorts.[152] Moreover, according to State's witness, Robert Hoehn, Cook *did not own nor wear any white clothing*.[153]

---

[147] We do not suggest in any way that Paula Rudolph is or has been less than truthful to the best of her ability in any way. We merely point out that the State's theory does not match with aspects of her testimony.

[148] (I Tr. 3 RR 510-11).

[149] (II Tr. 3 RR 167).

[150] (III Tr. 3 RR 165).

[151] (III Tr. 23 RR 985-87).

[152] (I Tr. 4 RR 708-10). Rodney Dykes's testimony before the grand jury corroborates that Cook owned and was seen wearing a pair of blue "boxing shorts" while staying at the apartment. (KMC 9293).

[153] (I Tr. 4 RR 708-10).

Another point of mismatch was Cook's hair length. On the night of the murder, Robert Hoehn described Cook's hair "all one length cut" reaching "down to his shoulder."[154] However, Paula's description of the figure's hair length remained constant over all three trials: "cut in a medium touching the ear fashion that men wear."[155] It was not "real long, wasn't down on the shoulders, wasn't super short."[156] In other words, it wasn't Cook.[157]

### *Height of the figure*

Relying on the height of the figure as described from Paula Rudolph's testimony to limit the pool of suspects is not as useful as it seems. During the first trial in 1979, Paula testified that the figure she saw was approximately the same height as herself, "maybe a bit taller."[158] She estimated that the figure was somewhere between 5 foot 3 inches to 5 foot 7 inches.[159] During the second trial, Paula again estimated that the figure was "maybe a couple of inches taller" than her height at 5 foot 6 inches.[160] For reference, when Cook

---

[154] (I Tr. 4 RR 708-10).

[155] (I Tr. 3 RR 510-11). She also described it as a "modern hair cut" that was "even about the ears" and that "[i]t's not short conservatively." (I Tr. 3 RR 552).

[156] (III Tr. 23 RR 986).

[157] (III Tr. 23 RR 1093) ("I will not swear under oath who it was.").

[158] (I Tr. 3 RR 483-84).

[159] (I Tr. 3 RR 577).

[160] (II Tr. 3 RR 273-78).

was arrested in 1977, he was listed as being 5 foot 7 inches tall.[161] Thus, Cook was within the height range as estimated by Paula. However, when Paula was asked to estimate the height of James Mayfield before the grand jury in 1977, a person she worked closely with, she estimated him to be 5 foot 6 to 5 foot 7 inches.[162] James Mayfield's actual height, however, was 5 foot 11 inches.[163] However, Paula, who worked alongside Mayfield for years, estimated that James Mayfield to be roughly 5 foot 7 inches tall—making him the same height as the figure as he appeared to Paula. We also note that Cook is very noticeably shorter—by 5 inches—than Mayfield. This is a "sizeable" problem for the case against Cook.

This widens the range of height that the figure could have been from anywhere between 5 foot 3 inches to 5 foot 11 inches. While this new range does not exculpate Cook (nor Mayfield), the ability to eliminate a mass of individuals from the pool of possible suspects based on height is severely diminished. While the record does not tell us the average height of adult men in 1977, it is undoubtedly the case that a large percentage of the male population fell within 5 foot 3 and 5 foot 11 inches.

*Inconsistencies regarding the "figure" are actually more consistent with James Mayfield.*

---

[161] (KMC1085).

[162] (III Tr. 23 RR 1078, 1079).

[163] For reference, Linda Jo Edwards, someone Paula Rudolph was living with for several weeks, was 1-2 inches taller than Mayfield measuring 6 feet in height. (III Tr. 21 RR 407; III Tr. 23 1164).

Though inconsistent with Cook, Paula's description of the figure (and reaction) was actually more consistent with James Mayfield. As mentioned above, Paula estimated the figure to be about 5 foot 7 inches—the height that she estimated James Mayfield to be.[164] Mayfield also had silver hair in 1977—just like the figure. Mayfield's haircut was also more consistent with the description from Paula's police statement ("cut in a medium touching the ear fashion that men wear") than Cook. Because he was a fitness buff, Mayfield was "tanned" and "trim." And because he played a lot of tennis, Mayfield was known to wear tennis outfits (like the tennis shorts worn by the figure) even when not playing.[165]

Paula Rudolph's behavior that night was also more consistent with Mayfield than Cook. Relying on what she had just seen, Paula told the figure "Don't worry, it's just me." Because she felt awkward with a half-naked "Mayfield" in the house, she headed straight for her room instead of putting her purse and keys down in the foyer.[166] Even after she heard the sliding door open and close, Paula did not leave her area of the apartment to lock the front or patio sliding door because she did not want to "spy" on Linda.[167] She felt safe enough to go to sleep with her bedroom door open.[168] Finally, after discovering Linda's

---

[164] (III Tr. 23 1164).

[165] (III Tr. 1065-66).

[166] (III Tr. 23 R 975).

[167] (III Tr. 23 RR 990).

[168] (III Tr. 23 RR 1077-78).

body the next morning, multiple witnesses—including Olene Harned, a witness that was beside her when the memory was at its freshest—heard Paula say that the figure she saw that night was Mayfield.

### *Cook's Fingerprints*

The only hard physical evidence connecting Cook to Linda Jo Edwards's apartment (not room) are his fingerprints on the patio sliding door. However, when viewed under the backdrop of the entire body of evidence, they are not as inculpating as the State presents them to be.

For context, hundreds of latent fingerprints were found throughout the apartment, but only a handful were detailed enough to be identifiable under the fingerprinting technology available in 1977.[169] The location of many of these prints included places like the inside portion of the front door, Linda's bathroom doorframe, and Linda's bedroom doorframe.[170] Of those hundreds, only thirteen of these latent prints were lifted by investigators using the application of conventional powder—the only method of lifting latent fingerprints by the Tyler Police Department at the time.[171] A majority of them were

---

[169] (I Tr. 3 RR 389).

[170] (I Tr. 2 RR. 242-43).

[171] Many of the modern forensic technologies such as digital fingerprint enhancement, specialized or sensitive chemicals, and even the ability to identify latent fingerprints left on skin were not available or even thought possible at the time. While the use of blacklights were available to some police departments, Tyler PD did not have them.

unidentifiable with the technology available or were found to be Paula's or Linda's fingerprints.[172]

Three latent fingerprints (clearly from the same hand) were found on the exterior of the patio sliding door parallel to each other and running on the edge of the door.[173] Sgt. Doug Collard, the Tyler PD forensics and fingerprint expert, testified that he was able to compare the latent prints lifted from the door and match one of them to Cook's left middle finger.[174] The accompanying prints were later matched to Cook's left ring and pinky fingers.[175] One weakened print was found inside the lower part of the door (corresponding

---

[172] From the latent fingerprints that were lifted, digital enhancement conducted years later found the following:

> III Tr. St. Ex. 128 (bottom edge of patio door) - inconclusive (III Tr. 20 RR 300-01).
> III Tr. St. Ex. 129 (inside front door) - Linda's right middle finger (III Tr. 20 RR 302).
> III Tr. St. Ex. 130 (bedroom doorframe left side) - nonusable (III Tr. 20 RR 302).
> III Tr. St. Ex. 131 (closet in Linda's bedroom) - nonusable (III Tr. 20 RR 303).
> III Tr. St. Ex. 132 (No. 7) (Linda's bathroom door) - "inconclusively" matched to Linda's middle and ring finger—but not enough to be a solid match. (III Tr. 20 RR 304).
> III Tr. St. Ex. 133 (No. 8) (glassware inside dishwasher) - Paula Rudolph (III Tr. 20 RR 305).
> III Tr. St. Ex. 134 (No. 9) (glassware inside dishwasher) - Linda's left index finger (III Tr. 20 RR 305).
> III Tr. St. Ex. 135 (No. 10) (dishwasher) - Paula's right thumb (III Tr. 20 RR 306).
> III Tr. St. Ex. 136 (No. 11) (dishwasher) - Linda's right ring finger. This print was somehow misplaced prior to the 3rd trial. (III Tr. 20 RR 306).
> III Tr. St. Ex. 137 (No. 12) (dishwasher) - Linda's right thumb (III Tr. 20 RR 306).
> III Tr. St. Ex. 138 (No. 13) (from scissors containing whorl pattern) - matched to Linda. (III Tr. 20 RR 306).

[173] (I Tr. 2 RR 242; I Tr. 3 RR 408, 410; III Tr. 20 RR 177-80). According to Sgt. Doug Collard, the patio door was already slightly open when he arrived at the scene by about 6 inches. (I Tr. 3 RR 408, 410).

[174] (I Tr. 2 RR 258-59).

[175] (III Tr. 20 RR 296-98).

to the other three prints), but it was not detailed enough to make a comparison.[176] Digital enhancement in 1992 enabled the latent print to be matched to Cook's left thumb.[177] Based on the positioning of the fingerprints, Sgt. Collard concluded that Cook could have only left the prints from inside the apartment with the patio sliding door at least slightly open.[178] Furthermore, the impression of the fingerprints suggested that Cook was in the process of pulling the sliding door towards the closed position when he made them.[179]

According to Sgt. Collard, Cook's latent fingerprints on the sliding door were "distinguishable" from the rest of the latent prints because they didn't react the same way to the fingerprint powders.[180] Per Sgt. Collard, the prints on the sliding door were "heavy perspiration" or "sweat" prints based on how well the powder latched onto them.[181] Sgt. Collard concluded that Cook was a "heavy secreter"[182]—a person who perspires more than

---

[176] (I Tr. 2 RR 244).

[177] (III Tr. 20 RR 261-70, 311-12).

[178] (III Tr. 20 RR 260-69).

[179] (I Tr. 2 RR 273, 305, 318; III Tr. 20 RR 276; III Tr. 22 RR 425).

[180] (III Tr. 20 RR. 282).

[181] (I Tr. 2 RR 305).

[182] According to William Watling, a forensics expert working for the federal government, the term "heavy secretor" was used incorrectly here by Sgt. Collard. A "human being secretor" actually refers to a person whose blood is secreted through body fluids—such as perspiration, semen, or saliva—allowing blood type to be determined through those body fluids. (III Tr. 21 RR 548). Despite the term's misuse by Sgt. Collard, we will continue to adhere to his definition for the sake of clarity in this opinion.

normal from their fingertips.[183] Thus, according to Sgt. Collard, heavy secreters like Cook left stronger and more pronounced fingerprints compared to non-heavy secretors.[184] Consequently, heavy secreter fingerprints last longer than non-heavy secreter fingerprints.

During the first trial in 1978, Sgt. Collard testified that it was his expert opinion that Cook's fingerprints were only 6-12 hours old.[185] Sgt. Collard based his expert opinion on the fact that direct sunlight and heat would "rapidly tear down a sweat print" and that fingerprints deteriorate over time.[186] This meant that Cook had touched the sliding door sometime between 8:00 pm of June 9 and 8:00 am on June 10, 1977—placing Cook in the apartment squarely within the timeframe of Linda's murder.[187]

### *The State's deception regarding the age of Cook's fingerprints*

This Court held in 1996 (after the third trial) that Sgt. Collard had knowingly misrepresented the age of Cook's fingerprints in his expert opinion because it was universally agreed by forensic experts that "[t]here is no scientific method to determine the exact age of a latent fingerprint."[188] A grievance was filed against him for this

---

[183] (I Tr. 2 RR 265). Sgt. Collard confirmed this conclusion when he took Cook's comparator fingerprints post-arrest. According to Sgt. Collard, the ink adhered more strongly than normal to Cook's skin when taking his comparator fingerprints. (I Tr. 2 RR 265).

[184] (I Tr. 2 RR 370-71).

[185] (I Tr. 2 RR 270).

[186] (I Tr. 2 RR 266-71).

[187] (I Tr. 2 RR 270).

[188] *Cook v. State*, 940 S.W.2d 623, 626 (Tex. Crim. App. 1996); (III Tr. 21 RR 530, 545); *see also* (I Tr. 2 RR 329) (acknowledging that T. Dickerson Cook, a leading authority on latent

misrepresentation. In a written response to International Association for Identification dated May 22, 1989, Sgt. Collard admitted that his "expert opinion" was not based on any scientific evidence and that he had been pressured by the district attorney to give misleading testimony.[189] This written response was not disclosed to the defense until 1992.[190]

As relevant to how his 6-12 hour opinion was formed, Collard admitted in his written response the following:

> My opinion was formed on the following basis:
> ***
>
> (2)    For the most part the latent was *protected from all elements or destruction* once placed. There was a[n] overhead patio cover and the area was fenced with a closed gate. The door area was recessed. The

---

fingerprinting, asserts that it is "impossible to guesstimate or approximate the age of a latent print.").

While giving his "expert opinion" that Cook's "heavy secreter" prints were only 6-12 hours old, Sgt. Collard was simultaneously aware that the FBI had issued a report where they had recently lifted Abraham Lincoln's latent fingerprint off a surface that was still visible to the naked eye. (I Tr. 2 RR 335).

[189] We note this as another instance where the State (via its agents) manipulated the facts to fit its theory. According to Sgt. Collard's response to a grievance filed with the International Association for Identification, Sgt. Collard admitted that both he and the District Attorney's Office were aware that the fingerprint age (6-12 hours old) was *not scientifically supportable*. Despite this awareness, Sgt. Collard detailed that the District Attorney's Office knowingly utilized him in a strategy to *intentionally deceive the jury* that there was scientific support for the age of the fingerprints. (KMC 1402-03). Prior to multiple appearances before the trial court, Sgt. Collard claimed that he asked the prosecutors that "this portion of the evidence not be used and each time it was still used." (KMC 1403). Yet each time, Sgt. Collard chose to continue with the prosecutorial deception.

[190] *Cook v. State*, 940 S.W.2d 623, 626 (Tex. Crim. App. 1996).

location where the latent was located *excluded normal contact to cause overlay or other destruction*.

(3)     *Knowing the approximate time the crime occurred.*[191]

These admissions made in his written response are inconsistent with his 1978 trial testimony where he concluded that the prints could only be 6-12 hours old because of the destructive effects of weather and the elements over time.[192]

During the third trial in 1993, Sgt. Collard (and the State) persisted in trying to label the fingerprints as "relatively fresh" and give the impression under his expert opinion that they were very recently produced.[193] However, William Watling, a senior fingerprint specialist working for a federal forensics lab in Chicago, testified that even the FBI had determined it was inappropriate to characterize a print as "fresh" or not because it is "not scientifically demonstrable or verifiable."[194] The same policy under the same justification was also maintained by Danny Carter, the Latent Print Section Supervisor for a Texas DPS forensics laboratory: "In my opinion, it is not an acceptable term, if you are using that to try to age or make a print new or old. It is not acceptable."[195]

---

[191] (KMC 1407) ("[Collard's] Response to International Association for Identification") (emphasis added).

[192] (I Tr. 2 RR 266-71). Sgt. Collard also admitted that knowing the time period of Linda Jo Edwards's death helped him formulate his scientifically unsupported "expert opinion" on the age of Cook's fingerprint on the sliding door. (I Tr. 2 RR 369).

[193] (III Tr. 21 RR 460).

[194] (III Tr. 21 RR 551).

[195] (III Tr. 21 RR 583).

Beyond their age, there are other inconsistencies with Cook's fingerprints on the patio sliding door in relation to the State's theory of Cook's guilt. First, none of Cook's fingerprints nor any other "distinguishable" heavy-secreter fingerprints were ever found anywhere else in the apartment—especially the bedroom where the murder occurred.[196] They were not present on any of the three murder weapons nor were any of the other unidentifiable latent prints shown to be from a "heavy secreter."[197] Thus, while the evidence showed that Cook had been in the apartment *at some point in time*, there was no evidence to show he had ever been inside Linda's bedroom.[198]

Second, Cook's fingerprints on the sliding door actually cuts against the State's theory. Based on Paula Rudolph's testimony and a drop of blood found on a terrarium top next to the sliding door, it is undisputed that Linda's killer left through the patio sliding door.[199] The victim's body also had bloody handprints, "grip marks," and rub marks

---

[196] *See* (III Tr. 20 RR. 282) (observing that Cook's fingerprints were "distinguishable" because they reacted differently than any other latent fingerprints found in the apartment).

[197] (I Tr. 3 RR 423).

[198] *See Ex parte Chaney*, 563 S.W.3d 239, 277 (Tex. Crim. App. 2018) ("The only remaining physical evidence that the State could rely upon was a partial left thumbprint found at the scene, which merely proves the undisputed fact that Chaney *was in the apartment at some point*, and some bloody shoeprints that the State could not connect to Chaney.").

[199] According to Sgt. Collard, when the killer opened the sliding door, he would have been right next to the terrarium top. Thus, the drop of blood could have only come from the killer as he was leaving. (III Tr. 21 RR 449). While it is almost certain that the killer left through the sliding door, it is unclear if the killer used the sliding door to enter. Texas Ranger Dowell concluded that

showing that the killer used his hands to hold and move the body into different positions.[200]

As Sgt. Collard noted, "whoever committed this crime would have had blood all over them."[201]

However, no blood particulates were found in Cook's fingerprints from the sliding door despite a microscopic examination by a senior research microscopist at a Chicago forensics lab.[202] No bloody rags, wet towels, or anything of that nature were found to demonstrate that the killer wiped his hands.[203] Furthermore, other than the commode which had not been flushed, the sink and bathtub showed no signs of recent use.[204]

The third inconsistency of the State's theory of the fingerprints is that there is evidence that shows these fingerprints could have been created days before the murder. Before the grand jury, Randy Dykes and Rodney Dykes both testified regarding an encounter between Cook and Linda. Several days before the murder, Cook and Rodney

---

the killer must have entered through the front door. (KMC 1295). Testimony shows that both the front door and patio sliding doors were unlocked.

[200] (III Tr. 20 RR 156). Closer and better detailed pictures of these bloody handprints were never taken, in part, because the ability to capture fingerprints off skin had not been developed yet. (III Tr. 22 RR 416-18). *See also supra* notes 116-21 and accompany text (detailing how the killer was "toying" with the victim's body).

[201] (III Tr. 21 RR 430).

[202] (III Tr. 21 RR 465).

[203] (III Tr. 21 430, 465).

[204] (III Tr. 21 RR 430-31).

Dykes went to the pool where they encountered a girl matching Linda's description.[205] At Cook's request, Rodney approached the girl and her companion, told them Cook's name and that Cook was interested in them.[206] According to both witnesses, Cook went to the girl's apartment later that evening and returned the next day "with all the hickies on him."[207] The story of Cook's romantic encounter and the "passion marks" were further corroborated by Hoehn's grand jury testimony.[208]

These corroborating accounts offer an alternative credible explanation for Cook's fingerprints on the patio sliding door.[209] It is much more consistent with why no "heavy secreter" fingerprints were found within Linda's room or on any of the murder weapons. It also explains why no blood particulates were found in the lifts of Cook's fingerprints from

---

[205] (KMC 9299, 9303-04). Rodney identified the girl's name as "Linda or Limma or something like that." (KMC 9303).

[206] (KMC 9300). During this encounter, Cook also met an off-duty law enforcement officer friend. Rodney testified that Cook and his friend conversed with each other while he completed various tasks at Cook's behest. *See also* (KMC 1457-58) (providing another accounting of Cook's encounter with Linda and her companion as seen by Rodney Dykes, and suggesting that Paula Rudolph was already acquainted with Cook before the murder).

[207] (KMC 9218). Rodney referred to these marks as "passion marks" that resulted from the girl "kissing him on his neck." (KMC 9303, 9293). James Taylor also corroborated seeing Cook with "[h]ickies all up the side of his neck, chest" days before the murder. (II Tr. 1 RR 104).

[208] (KMC 9261) (Smith County Grand Jury Proceedings Held on October 17, 1992: Examination of Bob Hoehne, at *15, 17, 20) (Hoehn testifying that he saw "passion marks on Cook and that Cook told him that he met Linda by the pool and then visited her apartment days before the murder).

[209] The grand jury testimony of Rodney and Randy Dykes is inconvenient to the profile of a disorganized lust murderer under the State's theory. It runs counter to the State's theory that because Cook was socially awkward and thus, somehow obsessed with fulfilling a sexual fantasy. This is discussed further below.

the sliding door. Nevertheless, despite offering an explanation that better fit with other evidence, the grand jury testimonies of Hoehn and the Dykes brothers were not disclosed to Cook's defense team until years after the first trial.[210]

### *Problems with the Crime Classification and Criminal Profile*

The State's efforts to use crime classification to show that Cook fit the resulting criminal profile were also inconsistent.[211] Law enforcement classified the murder as a "lust murder" of the "disorganized" type—a subcategory of sexual homicides—after noting the nature and manner of violence distributed against Linda.[212] According to the FBI Crime Classification Manual, a "lust murder" is characterized by violence focused against a victim's gender or sexually significant organs.[213] As the opposite of rape, the offender uses non-sexual attacks (cutting, eviscerating, or the taking of souvenirs as opposed to sexual penetration) to fulfill a sexual desire of the offender.[214] According to FBI research, the killer is often trying to remove the sexually offensive parts of his victim due to his sexual

---

[210] *Cook v. State*, 940 S.W.2d 623, 626 (Tex. Crim. App. 1996).

[211] "Crime Classification" is a method of organizing or categorizing violent crime based on its traits and characteristics. (III Tr. 22 RR 791). The basic classes are based on the primary motive or intent of the offender and are listed in the FBI's Crime Classification Manual. (III Tr. 22 RR 791). A criminal "profile," on the other hand, is a specific list of traits and characteristics of an offender. "Profiles" are a product of the criminal investigative analysis of the evidence at a crime scene. (III Tr. 22 RR 880-81). By observing the results of behavior at a crime scene, investigative leads on an offender's identity—who might have committed this crime—may be revealed. (III Tr. 22 RR 880-81).

[212] (III Tr. 22 RR 661, 663, 800).

[213] (III Tr. 22 RR 822).

[214] (III Tr. 22 RR 831).

inadequacy or sexual ambivalence.[215] Anti-social in nature, the lust murderer feels hatred and rejection for his society. Furthermore, unlike the "organized" type where the crime is preplanned, methodical, and the victim (or victim class) is targeted; a "disorganized" lust murder is spontaneous and unplanned. A disorganized lust murderer typically uses weapons found at the scene and leaves them behind. He is not concerned about leaving forensic evidence behind and does not bother transporting the body after the killing to prevent its discovery.[216]

For many of the evidentiary characteristics listed above, the murder was classified as a disorganized lust murder. Although State experts asserted that this could not have been a domestic homicide staged to look like a lust murder (aka a "staged domestic homicide"), there were factors that were consistent with a domestic homicide.

First, the State's experts all agreed that there were no defensive wounds on Linda's forearms nor any scrapings under her fingernails to show that she fought back.[217] In fact,

---

[215] (III Tr. 22 RR 845-46). FBI Special Agent Gomez testified in a midtrial Bill of Exception in 1994 that homosexual or bisexual oriented individuals exhibited the sexually inadequate/ambivalent behavior necessary as a prerequisite to a lust murder. (22 RR 868-73). But in 2016, he was refuted by an editor of the FBI Crime Classification Manual and former member of the FBI Behavioral Science Unit, Gregg McCrary. *See* KMC9311 ("Affidavit of Gregg McCrary"). In his affidavit McCrary asserted that Gomez was relying on data that doesn't exist to reach a mistaken conclusion. McCrary clarified that lust murderers were "predominantly heterosexual." (KMC9311). Moreover, McCrary stated that in addition to their rarity, it is "unusual for a homosexual or bisexual lust murderer to target a female." (KMC9311).

[216] (III Tr. 22 RR 812-15).

[217] (I Tr. 5 RR 850).

despite her larger six-foot frame and weight of 140-150 pounds, State experts uniformly agreed that Linda Jo Edwards was completely surprised when attacked.[218]

Second, there were numerous wounds beyond those focused at the sexually significant areas.[219] In a domestic homicide (where two people have had a long-term relationship), State experts agreed that it is common to find facial trauma as the result of repeated blunt force attacks to the face and head—depersonalization attacks.[220] In this case, a number of the teeth were knocked back and there were substantial blows to her face and eye.[221] There were also nine stab wounds to the throat and neck, and some slashing at the mouth.[222] As the profiling expert asserted, repeated attacks to the neck or throat may indicate domestic rage where the killer is trying to silence the victim.[223] Additional wounds were found on the chest and back. Of the wounds to the chest, only one penetrated the breast.[224]

---

[218] (III Tr. 21 RR 407; III Tr. 22 RR 671). There is evidence to suggest that Linda was awake when first attacked. The ironing board was set up with the iron on and in the low setting. Furthermore, the TV was also found on.

[219] (I Tr. 5 RR 849-79).

[220] (III Tr. 22 RR 757, 823, 860).

[221] (III Tr. 22 RR 757-61).

[222] (III Tr. 22 RR 836-37, 862).

[223] (III Tr. 22 RR 861).

[224] (I Tr. 5 RR 866).

Cook also didn't fit the profile of a lust murderer. According to the State's FBI expert, a lust murderer typically begins where an anti-social person develops a long-term sexual fantasy of some sort.[225] After various environmental cues or a buildup of precipitating stressors, the person is triggered to commit sexual homicide.[226] Though "organized" lust murderers tend to have a preferred type of victim, "disorganized" killers tend to be more random, i.e. targets of opportunity.[227] Again, unlike rapists, the offender uses non-sexual attacks (cutting, eviscerating, or the taking of souvenirs as opposed to sexual penetration) to fulfill a sexual desire of the offender.[228]

Unlike the profile, Cook was not a loner or social outcast who rejected or felt rejected by society. Cook was able to socialize even romantically with others as shown by testimony from James Taylor, Bob Hoehn, Rodney, and Randy Dykes. Additionally, if he had a fixation on dark-haired women as the State suggests,[229] Cook was not relegated to merely fantasizing about it in an obsessive fashion.[230] Not only did Cook and Linda Jo

---

[225] (III Tr. 22 RR 810-11, 825-26); (KMC 9311-14); Douglas, John & Hazelwood, Robert, *The Lust Murderer*, 49 FBI L. Enf. Bulletin 4 (April 1980).

[226] (III Tr. 22 RR 825-27).

[227] *See* (III Tr. 22 RR 813) (discussing Ted Bundy).

[228] (III Tr. 22 RR 831).

[229] *See* (I Tr. 4 RR 727-31, 794-99, 806) (trial testimony by Edward Jackson claiming that Cook verbally expressed an urge to do very violent acts against dark-haired women depicted in Playboys and Hustlers they viewed together compared to depictions of non-dark-haired women which Cook had no reaction to).

[230] It is emphatically noted that the State had to manufacture evidence to allege Cook had a fixation on dark-haired women in order to fit the killer's profile. *See* Pretrial Hr'g, Test. Edward Scott Jackson, Nov. 25, 1992 (Jackson admitting fabricated his trial testimony after being provided

Edwards know each other, testimony from the Dykes brothers show that Cook had a consensual physical encounter resulting in "passion marks" with Linda days before her murder—in her apartment, by her invitation.[231]

Nevertheless, in support of its theory that Cook matches the profile, the State points to the alleged homosexual activity between Cook and Robert Hoehn.[232] The State argues (*even in the present day*) that this activity is evidence of Cook's sexually deviant nature, and that this act combined with other heterosexual pursuits is a sign of sexual ambivalence and sexual inadequacy.[233] The State contends that this sexual ambivalence was the basis for the twisted sexual fantasy motivating Cook to commit such a gruesome act.[234]

---

crime scene evidence by the District Attorney's Office in exchange for lowering a potential life sentence under a first degree murder charge to only two years of imprisonment with time served under a manslaughter charge).

[231] At least three witnesses observed "hickies" or "passion marks" on Cook's neck and chest. *See e.g.*, (II Tr. 1 RR 104).

[232] Cook has always denied that any sexual relations between him and Hoehn ever occurred. Furthermore, and as noted previously, Hoehn stated that he did not have sexual relations with Cook in a withheld interview statement made to prosecutors in direct contradiction to Hoehn's testimony during trial.

[233] (III Tr. 22 RR 845-46, 868-73, 885-86).

[234] In support of their assertion that Cook fits the profile, the State points to the testimony of Dr. Jerry Landrum as evidence of Cook's irredeemably violent and psychotic disposition. (III Tr. 36 RR 3316). Dr. Landrum testified that he diagnosed Cook as having an irreversible and untreatable anti-social personality disorder. (III Tr. 36 RR 3312-3316). And because of his psychological anti-social condition, according to Dr. Landrum, Cook posed an absolute "threat of continuing violence, whether on the streets, whether in jail or prison or death row. He is a continuing threat of violence, not only to himself but people that have to work with him and other convicts." (III Tr. 36 RR 3316). During the first trial, Dr. Landrum assessed Cook as being within the "severe psychopathic category." (I Tr. 7 RR 1231).

Furthermore, the State contends that the triggering event was Cook's inability to reach climax (sexual inadequacy) during the encounter according to Hoehn.

---

During the early portion of the murder investigation, Dr. Landrum, *also a resident of Paula and Linda's apartment complex*, reviewed slides of the body and crime scene to create a psychological profile of the killer. He concluded that "the suspect was a Male between the ages of 18 and 30 and that the subject was possibly homosexual, that the subject would be very introverted, possibl[y] impotent, that the subject would possibly be on some type of drugs and that he might be an epileptic." (KMC 1158). This was later refuted by the psychologist Dr. Frederick Mears who, based on his "familiarity with the literature," found Dr. Landrum's profile "exactly backwards." (KMC 0027). "The common profile is for a gay male, if he is also a mutilator, to do so to a male adult or a male child" and not target females. (KMC 0027).

Moreover, Dr. Landrum has proven particularly prone to diagnosing patients with anti-social personality disorder and declaring them continuingly dangerous. In *Garcia v. State*, Dr. Landrum was an expert witness called to examine a defendant accused of capital murder to see if he might be a continuing threat to society. *Garcia v. State*, 626 S.W.2d 46 (Tex. Crim. App. 1981). The defendant informed Dr. Landrum that he refused to talk with him. After sitting in 30 minutes of silence, Dr. Landrum, without obtaining any history or information concerning the defendant's mental condition, concluded defendant suffered from aggressive anti-social personality disorder. On discretionary review, this Court concluded that "Dr. Landrum's testimony is ludicrous in light of the record before us and cannot be seriously considered . . . ." *Id*. at 51.

The most revealing demonstration of the unreliability of Dr. Landrum's diagnosis is Cook's post-diagnosis behavior. Under Dr. Landrum's diagnosis, once he was released from prison, Cook should have left a string of victims to his uncontrollable "severe psychopathic" urges. However, even decades later, there is no record of such behavior.

We also note that Dr. Landrum did not accurately represent his own credentials. During the third trial in 1994, it was revealed that Dr. Landrum did not actually have a doctorate in psychology as defined by his graduating university even though he represented himself to the 1978 jury to have a psychology doctorate. According to a disciplinary hearing before the Board of Examiners of Psychologists, Dr. Landrum has a masters in psychology but a doctorate in "counseling and personnel administration" which shared some of the same coursework. St. Exh. 236 at p.274. When asked why he held himself as having a psychology doctorate to the 1978 jury, Dr. Landrum testified that he was merely "simplifying" it for the jury. (III Tr. 37 RR 3360).

But the State's theory doesn't make sense in light of FBI Supervisory Special Agent Gregg McCrary's 2016 affidavit.[235] The State's theory *once again* smacks of trying to adjust facts to find guilt.[236] If Cook was either homosexual or bisexual as the State asserts, it would have made him *far less likely* to have murdered Linda Jo Edwards.[237] As Supervisory Special Agent McCrary asserted, lust murderers are "predominantly heterosexual," rendering homosexual and bisexual lust murderers a rarity. Furthermore,

---

[235] FBI Supervisory Special Agent Gregg McCrary is one of the original editors and committee members that created the FBI's Crime Classification Manual. When the first edition of the FBI's Crime Classification Manual was published in 1992, McCrary was serving as a Supervisory Special Agent at the FBI Academy at Quantico and working with the Behavioral Science Unit within the National Center for the Analysis for Violent Crime. Even by Special Agent Gomez's admission, McCrary is far more experienced in the investigation of lust murders. *See* John E. Douglas *et al., Crime Classification Manual: A Standard System for Investigating and Classifying Violent Crimes*, 371-72 (1992); *supra* notes 81-84 and accompanying text. His expertise and experience in behavioral criminology, especially as it relates to homicides and violent sex crimes, is extensive. (KMC 0033-0050).

[236] According to Supervisory Special Agent McCrary, Special Agent Gomez misrepresented the basis for his conclusion thereby leaving a false impression with the jury:

> Mr. Gomez also states in his affidavit that he was relying on his experience with the LAPD where he was "aware of" homosexual and bisexual men committing lust murders on females who were unknown to them, and providing training on those cases. To my knowledge, there are no cases.

(KMC 9311) ("Affidavit of Gregg McCrary"). This is consistent with the affidavit of Dr. Frederick Mears, a psychologist, asserting that the scientific literature does not commonly support the profile of a homosexual male lust murderer to target females. (KMC 0027).

[237] Supervisory Special Agent McCrary pointed to an FBI Law Enforcement Bulletin article published authored by John Douglas—Spec. Agent Gomez's unit supervisor, coauthor of the FBI's Crime Classification Manual, Sexual Homicides: Patterns and Motives (both books relied on by Gomez)—to show that "while the victim may be male or female, the crime [lust murder] is predominantly heterosexual and intraracial in nature." Douglas, John & Hazelwood, Robert, *The Lust Murderer*, 49 FBI L. Enf. Bulletin 4 (April 1980).

according to Supervisory Special Agent McCrary, "it is unusual for [a] homosexual or bisexual lust murderer to target a female."[238]

Using the alleged homosexual encounter as the triggering event does not make sense. The State's theory is that Cook's inability to reach climax with a homosexual partner left him in a state of unfulfilled frenzy—which mentally propelled him towards killing. But according to their own witness, Robert Hoehn, Cook reached climax via masturbation at the end of their encounter—which would have had the opposite effect on his state of mind.[239] Per the State's timeline, Cook would have had to commit the murder during this refractory period where he would have been *far less likely* in need to seek sexual gratification.[240] This is especially true where the crime was classified as a "disorganized" murder which has little to no premeditation.[241]

Thus, if the alleged homosexual encounter with Cook is true (which Cook denies), then it affirmatively exculpates Cook. If it is not true (contrary to the State's theory), then the State completely loses its ability to show the following: (1) Cook was sexually ambivalent; (2) Cook was at a pinnacle of feeling sexually inadequate; and (3) Cook was

---

[238] (KMC 9311) ("Affidavit of Gregg McCrary").

[239] (I Tr. 4 RR 705, 719-20).

[240] *See* (III Tr. 22 RR 831) (discussing the lust murderer's use of non-sexual attacks to fulfill sexual desires).

[241] *See* John E. Douglas, et al., *Sexual Homicides: Patterns and Motives*, at ix (The Free Press 1988) (describing disorganized murderers as "less consciously aware of a plan").

86

in a state of sexual urgency which propelled him to kill. Despite the State's attempts to habilitate the profile of the killer to fit Cook, the evidence points away from Cook's guilt.[242]

### *The Missing Hair on the Buttocks*

A dark-colored hair *with a bloody root* was found stuck to the victim's buttocks during the autopsy.[243] Per Sgt. Collard, the hair likely became attached to the victim due to the presence of moisture and the texture of the skin.[244] In 1977, the hair was sent to a DPS forensic lab in Tyler for microscopic examination.[245] There, Joe Hogan, a forensic serologist and hair analyst, concluded that the hair was definitely human and was from a person's head. The hair was compared microscopically to the 14 sample hairs taken from Cook's head and pubic regions respectively. The hair with a bloody root was also compared

---

[242] As Supervisory Special Agent McCrary concluded in his affidavit:

> In summary, the investigation into the murder of Ms. Edwards was in improper use of profiling, as the profile constructed by Dr. Landrum was done prior to a thorough, competent investigation. Mr. Gomez came to his conclusions without a complete review of the investigative file and that is a prerequisite before constructing any profile. Even then, the classification of Ms. Edward's murder as a lust murder committed by a homosexual or a sexually ambivalent perpetrator is an opinion that is without basis in fact, fundamentally flawed and inconsistent with the published findings of the FBI regarding lust murderers.

(KMC 0032).

[243] (III Tr. 20 RR 217); App. 2 to St. Br. in Opp'n, at 6.

[244] (III Tr. 20 RR 217).

[245] (III Tr. 21 RR 959-99).

to hair from Linda's head and pubic region. Hogan concluded that the bloody hair did not match Cook nor Linda.[246] Because the hair was not silver, James Mayfield was also ruled out. This hair was never compared to Elfriede or Louella.[247]

During the third trial, the State sought to minimize this evidence by showing that the body was found lying buttocks-down on "shag" carpeting. The State adduced testimony that this type of carpeting was hard to clean and could retain hair from "3 tenants ago."[248] Thus, per Sgt. Dusty Heskew, the hair including its bloody root was not necessarily indicative of who murdered Linda.[249]

The State's attempt to minimize the hair, instead, highlights the hair's evidentiary value. It is highly unlikely that a human hair from "3 tenants ago" survived multiple cleanings only to easily attach to the victim's buttocks because of skin moisture and texture.[250] Thus, the hair with a bloody root found on the victim's buttocks could have very well come from the killer. Consequently, the hair was submitted on February 8, 1999, (after the third trial but before the fourth) for DNA testing together with the terrarium top, Linda's

---

[246] (III Tr. 21 RR 611-13, 637); App. 2 to St. Br. in Opp'n, at 6.

[247] (III Tr. 21 RR 637).

[248] (III Tr. 22 RR 779).

[249] *Id*.

[250] *See* (III Tr. 20 RR 217) (Sgt. Collard suggesting that the hair may have been picked up by moisture on the buttocks); (III Tr. 22 RR 779) (Sgt. Heskew, an expert witness for the State, asserted that shag carpet can retain hairs from "3 tenants ago" despite deep cleanings).

bra, and the carving knife.[251] The DNA of the hair with the bloody root was to be compared to DNA extracted from blood specimens provided by Cook and James Mayfield.[252] The results would have been another piece of *new evidence* which could have pointed towards the true killer.

Despite Cook's request, the hair with a bloody root was *selectively* destroyed—the hair and *only* the hair—before being tested. There has never been a credible explanation as to why there was a selective destruction of a single piece of evidence (out of several pieces) that was preliminarily known to be exculpatory.[253] The reason given by the State for the destruction of the hair was based on Texas Code of Criminal Procedure Article 38.43(c)(2), which allows for the destruction of evidence after a defendant completes their sentence. However, under that rule, the State was required to give Cook notice via his attorneys that it was about to destroy evidence. Cook and his attorneys maintain that the State never gave the required notice of destruction. Moreover, it is unclear why the State would choose to destroy only the hair with a bloody root under this reason and not other evidence along with it.

### *Bob Wickham's Testimony of Cook's Alleged Voluntary Confession*

---

[251] (KMC 0778, 1364).

[252] (KMC 0778).

[253] As discussed above, a hair analyst had already determined that the bloody hair did not come from Cook or Linda.

During the first trial in 1978, Bob Wickham, a volunteer reserve deputy sheriff, was called to serve as a bailiff at the Smith County Courthouse.[254] Wickham was tasked with escorting Cook from the jail in the basement to the courtroom for jury selection.[255] While riding in a secured elevator directly to the courtroom floor in 1978, Wickham testified that the following exchange took place with Cook:

> He asked me what I was – what I would do if he broke and run. And I told him I would shoot him. And he looked at me and said, "You would do it, wouldn't you." And I said, "Yes, I would." And then he said, "Do you think I killed the girl?" I said, "I don't know. That's for the jury to decide." He said, "I killed her and I don't give a sh_t what they do to me."[256]

Immediately following Wickham's testimony on the stand, Cook, who had remained silent during the trial, called him a liar in front of the jury and accused Wickham of "making all that up, every damn bit."[257]

Wickham testified that he was alone with Cook when the exchange took place and that all of the statements were made before the elevator doors opened. Once he arrived in the courtroom, he did not inform the prosecutors that the conversation took place.[258] Nor did he make any written report of the exchange despite having received law enforcement

---

[254] (III Tr. 24 RR 1448).

[255] (III Tr. 24 RR 1450).

[256] (III Tr. 24 RR 1453).

[257] *Id.*

[258] (III Tr. 24 RR 1461).

training to do so.[259] Instead, several weeks passed by before he told a DPS trooper friend, Glenn Miller, of Cook's alleged statements.[260]

Approximately thirteen years passed before Wickham relayed the statement to a detective in the Tyler Police Department in 1991.[261] At this point, the case was receiving media attention and was already highly publicized leading up to the second trial.[262] Wickham finally wrote out a formal statement at the behest of the District Attorney's Office only six to eight of months before the second trial—and thirteen years after the first trial.[263]

However, Wickham's story is uncorroborated because nobody else was in the elevator. First, why Wickham, a certified peace officer, waited roughly thirteen years before reporting a voluntary confession to an investigating authority is inexplicable.[264] Despite having received this incriminating confession, Wickham could not remember

---

[259] (III Tr. 24 RR 1463, 1487).

[260] (III Tr. 24 RR 1466).

[261] (III Tr. 24 RR 1467).

[262] (III Tr. 24 RR 1487).

[263] (III Tr. 24 RR 1467).

[264] *See* (III Tr. 24 RR 1473) (showing Wickham to be trained in writing reports as part of his training as a certified peace officer).

exactly how long afterwards he told his Trooper friend, Glenn Miller, of this significant happening: "It was a week, two weeks, three weeks, I don't know."[265]

Second, the details he gave were inconsistent. In a 1992 hearing, Wickham testified that Cook was wearing a "one piece jail jump suit" and handcuffed during *jury selection in a capital murder trial where the State was pursuing the death penalty*—something Cook's attorneys would have objected against because it would have interfered with the presumption of innocence.[266] Yet, two years later, during the third trial, Wickham could not remember what Cook was wearing on that day in 1978.[267]

Third, Wickham's statement to the authorities actually investigating the case was made just in time for the second trial and when he was aware media attention was focused on the legal turn of events in Cook's case.[268] Cook was the very first prisoner that Wickham had ever escorted.[269] Though Wickham testified he had nothing to gain, it was presented to the jury by the defense that he had a lot to gain in standing from his numerous law enforcement friends.[270] This motivation is consistent with the assertions of McCloskey's Affidavit claiming Wickham to be "untruthful" and a "wannabe" officer.

---

[265] (III Tr. 24 RR 1486).

[266] (III Tr. 24 RR 1479).

[267] (III Tr. 24 RR 1477-79).

[268] (III Tr. 24 RR 1467, 1472).

[269] (III Tr. 24 RR 1461).

[270] (III Tr. 24 RR 1490-91).

Finally, Wickham's testimony does not alleviate any of the problems with the rest of the State's evidence. The timeline of events, with Cook alleged as the killer, is still practically impossible. It does not explain how Cook, a person with no history of violent crime, could have accomplished a murder with traits from multiple twisted pathologies in mere minutes.[271] Wickham's story, furthermore, does not explain why Cook's fingerprints are nowhere in Linda's bedroom nor why they have no blood particulates on them on the sliding door. Moreover, Wickham's story does not explain why Cook's DNA was not found on any of the murder weapons, the body, nor on anything else at the scene—while Mayfield's was.

### *The DNA/Semen in the Underwear, the Deposition of James Mayfield, and The Sexual Criminal*

It is ironic that shortly before DNA testing began, the then-prosecutor declared that the DNA from the semen stain on the victim's panties "could have only been left by the killer."[272] Nevertheless, while DNA profile testing on multiple pieces of evidence was still pending, Cook pled "no contest" to the lesser charge of murder on February 16, 1999. However, on April 8, 1999, a DPS forensics lab produced the DNA test results for the drop of blood on the terrarium top, the victim's bra, the knife from the bedroom, and a semen

---

[271] *See infra* note 289 and accompanying text (discussing the multiple sexual homicide pathology traits shown by the crime scene photographs).

[272] (KMC 0018). In his 2016 affidavit, David Hanners, an investigative journalist who had extensively covered the case, recounted that one of the prosecutors on the case made the above statement in 1999 sometime prior to requesting DNA testing and Cook's plea agreement.

stain on the crotch portion of the victim's panties.[273] Cook and Mayfield were both excluded as possible contributors to the DNA profile found in the blood drop on the terrarium top and the victim's bra.[274] Though a test found the stains on the knife were found presumptively positive for blood, no DNA could be recovered for testing.[275] Nevertheless, a DNA profile was recovered from the panties. Though Cook was excluded as a possible contributor, the profile generated from the semen was consistent with the DNA profile of James Mayfield.[276]

In light of this incriminating revelation and almost forty years after the murder, James Mayfield, under an immunity agreement, was deposed in 2016. As recounted above, the testimony he gave directly contradicted previous trial testimony and revealed several material facts for the first time. As a recap:

- Despite previously claiming he did not have sex with Linda Jo Edwards for three weeks, after forty years Mayfield admitted for the first time to having had sex with Linda, less than two days before her murder (his birthday, June 8, 1977).[277]

---

[273] (KMC 0789).

[274] *Id*. The 1999 DNA test was only able to generate a partial DNA profile from the drop of blood on the terrarium top. Linda was suspected to be the source.

[275] (KMC 0798).

[276] (KMC 0797-98).

[277] (KMC 8981-83). In contrast, Mayfield in previous testimony denied having any sexual intercourse for the three-week period Linda was staying with Paula. (II Tr. 6 RR 194).

- Mayfield admitted that his affair with Linda had "ruined him" and that he knew he needed to avoid her. He also admitted contrary to prior testimony that he had made comments to that effect to others immediately following the murder.[278]

- Mayfield admitted that, in addition to his career ending, his marriage was in jeopardy. His wife had already consulted an attorney for a possible divorce. If his wife had discovered any further sexual encounters with Linda, his marriage would be over. "I wasn't going to destroy my marriage for Linda."[279]

- Yet, Mayfield admitted that he could not help himself when he was near Linda. Whenever they were together, it would result in a sexual encounter.

- Furthermore, Mayfield acknowledged that Linda was very reliant on Mayfield for her daily life needs. "If she needed help, I was going to help her. I – that's the way we felt about her. We bought her clothes, we did everything for her."[280] Additionally, since the sexual encounter, Mayfield acknowledged that Linda had increasingly sought him out for help addressing car trouble and apartment hunting.[281]

---

[278] (KMC 9050-51); *see also* (KMC 0005) ("Affidavit of Ann White" stating that while at the murder scene, "Mr. Mayfield became angry and told me that [Linda] had ruined him, and that she had cost him his job and caused a lot of problems for him.").

[279] (KMC 9018-19).

[280] (KMC 9017).

[281] Hours before the murder, Mayfield and his wife returned home from dog training to find Linda waiting for him in front of their house. Linda suspiciously claimed she had just been visiting the neighbors. According to Mayfield's final deposition, this was Mayfield's third encounter with Linda that day. Mayfield described Linda first approaching him in the dining hall at noon while he was with other members of the faculty. The second encounter was when Linda

- Following Linda's murder, Mayfield acknowledged becoming aware that Paula Rudolph told others at the university that she had seen him the night before in Linda's room.[282]

- Mayfield also admitted knowing about the book, *The Sexual Criminal—A Psychoanalytical Study* by J. Paul De River, and its violently graphic nature. Though he denied being responsible for ordering the book, he acknowledged being in a dispute with Dr. Mears, a psychologist at the university, about its presence in the library. Counter to Dr. Mears's stance that the graphic nature of the book made it inappropriate for the library, Mayfield testified that he refused to remove the book from the library collection.[283]

- Finally, Mayfield denied ever asking Dr. Mears for help, in light of his Ph.D. in psychology, with "beating a polygraph."[284] Mayfield did admit to failing his first polygraph before passing a second.[285]

The DNA profile results are inculpatory against Mayfield (and *independently* exculpatory for Cook). Significantly, the results from the semen stain on the victim's panties directly connect Mayfield to the scene of the crime—Linda's bedroom—where

---

asked him to meet at a Dairy Queen to look at an apartment that wasn't available yet. During this third encounter, Linda asked Mayfield to look at her car.

[282] (KMC 9029-31).

[283] (KMC 9052-58).

[284] (KMC 9058-59).

[285] (KMC 9070-71).

before, there had been no direct connection.[286] The results also prove James Mayfield lied under oath—casting a long shadow on all of his claims including even his 2016 deposition testimony, where he effectively asks the Court to believe that *this time, everything he says is true*.[287] Specifically, James Mayfield misrepresented in two trials and numerous depositions under oath that he had no sexual relations with Linda Jo Edwards for roughly three weeks. And in deceiving the police, the jury, Cook's defense team, and the public at large, Mayfield effectively diverted a substantial amount of suspicion away from himself and onto Cook.

Furthermore, although Mayfield finally admitted that he had sex with Linda two days before the murder and not again on the day of the murder, this is implausible. This

---

[286] It is noteworthy that the FBI Crime Classification Manual (which State's experts relied on) states that a common forensic finding in "Disorganized Sexual Homicides" (aka Disorganized Lust Murders) is that "evidence of semen may be found on the victim's clothing and (less frequently) in the victim's wounds." John E. Douglas, et al., *Crime Classification Manual: A Standard System for Investigating and Classifying Violent Crimes* 130 (1st ed. 1992). It is frustratingly baffling why Sgt. Doug Collard, the Tyler PD forensic expert in charge of the scene, chose not to send the panties to a lab for forensic examination in 1977.

[287] As this Court said in *Ex parte Reed*,

> To establish falsity, the record must contain some credible evidence that clearly undermines the evidence adduced at trial, thereby demonstrating that the challenged testimony was, in fact false. While various types of evidence may serve to demonstrate falsity, the evidence of falsity must be "definitive or highly persuasive." That said, the testimony need not be perjured in the penal-code sense for it to be false in the due-process sense—it is sufficient if, considered in its entirety, the witness's testimony left the jury with a false or misleading impression. On habeas, the applicant has the burden to show falsity by a preponderance of the evidence.

*Ex parte Reed*, 670 S.W.3d 689, 766 (Tex. Crim. App. 2023) (internal citation omitted).

would mean that from the time she engaged in sex with Mayfield, the victim had not changed her underwear in roughly two days.[288]

Mayfield's knowledge and 1977 possession of the book, *The Sexual Criminal—A Psychoanalytical Study* by J. Paul De River, is further incriminating. It would have provided a useful "instruction manual" to anyone trying to disguise a murder as a sexual homicide. The similarity between the photographs from the book and photographs of the crime scene are near-identical.[289] Several of the crime scene photos (KMC 0477, 0478, and 481) are strikingly similar to pictures found on pages 122, 108, and 126—all depicting victims categorized as "Lust Murders" in the book. On the other hand, (KMC 0479)—also

---

[288] The State asserts that semen DNA can survive the wash. But that explanation seems weak in light of the fact that Mayfield claims they didn't have sex for three weeks followed by sex on June 8, 1977. This leaves only the following scenarios assuming Mayfield is telling the truth this time:

(1) After sex on June 8, 1977, Linda didn't change her underclothes for almost 48 hours.
(2) Linda had a sexual encounter with Mayfield at least three weeks before the murder, cycled her underwear through both wearing it and washing it multiple times over three weeks, and then just happened to wear the same ones again on the day she was murdered. And by happenstance, the residual semen DNA surviving those cycles and surviving decades of evidence room storage happened to be pronounced enough to be detected by the DNA testing available at the time in 1999.

While not impossible, neither of these scenarios seem very likely. *See Ex parte Reed*, 670 S.W.3d 689, 750-51 (Tex. Crim. App. 2023) (finding it highly unlikely that after consensual sex as claimed by the defendant, a murder-rape victim "put her underwear back on, worked a full shift at H-E-B, came home, visited with her family, and then went to bed, all in the same [soiled] underwear. More likely than not, the jury would have rejected that version of events . . . .").

[289] *See* (KMC 0477-82) (showing nearly identical side-by-side comparisons of crime scene photos and pictures taken from the book, *The Sexual Criminal—A Psychoanalytical Study* by J. Paul De River, especially in terms of the presentation of the body as posed by the killer and the nature of the wounds inflicted).

strikingly similar to a crime scene photograph of the wounds to Linda's back—comes from page 27 which deals with juvenile sadism. The crime scene photograph (KMC 480) showing the blunt force trauma to the face is similar to the work of a "Sadist Raffine" in the book. Finally, the pose of the body in the last crime scene photo (KMC 0482) is consistent with that of a necrophilia victim from the book.

It is notable that the crime scene photos were comparable to pictures in the book of a variety of different pathologies (i.e., juvenile sadism, sadist raffine, necrophilia, lust murder, etc.). The fact that these categories each possess different traits and distinctly different motivations undermine the State's confidence in Gomez's classification and criminal profile conclusions. Moreover, the suspicious mix of traits from a variety of different homicidal pathologies gives affirmative credence to the possibility that the murder actually was a domestic homicide staged to look like a lust murder—though not definitively.

## CONCLUSION

The State's theory of the case completely relies on the evidentiary pillars of *motive* (the lust murderer in a frenzied state of mind) and *opportunity* (the time frame to commit the murderous act coupled with presence at the scene). However, Cook has shown that the reliability of these pillars are elusive: It is improbable that Cook had the time to commit the murder, and he doesn't fit the State's criminal profile which would have motivated him to commit the murder. Furthermore, Cook has shown these twin pillars to be plagued with rot and cracks from repeated misconduct and other missteps.

Between the bookends of deception from the start of the case till the admission of Mayfield's repeated perjury in 2016, it is clear that Cook never enjoyed the full panoply of protections guaranteed under the Constitution.[290] Several actions of the State go beyond gross negligence and reach into the realm of intentional deception against the tribunal.[291] Cook spent close to a decade and half on death row from the very beginning based on a web of fabricated testimony and misrepresentations. Even if Cook had been made aware of the deception, Cook was left with little-to-no legal recourse because it was outside the record on appeal. During that time, the record documents that Cook was subjected to extreme physical abuse and psychological trauma by other inmates. This included several emasculating tattoos forcibly carved into Cook's back and side—which led him to attempt

---

[290] The repeated denial of the "full panoply of constitutional protections" itself is a "fundamental miscarriage of justice." *Schlup v. Delo*, 513 U.S. 298, 314 (1995). Though *Schlup* type claims are typically used as a special exception to the subsequent writ bar, we find its underlying principles applicable here even though Cook does not face this procedural obstacle. *See also Ex parte Miles*, 359 S.W.3d at 671 (relying on previously undisclosed *Brady* evidence and the resulting investigation as affirmative evidence establishing Applicant's actual innocence).

[291] Under the Texas Disciplinary Rules of Professional Conduct:

> A lawyer shall not knowingly:
> (1) make a false statement of material fact or law to a tribunal;
> (2) fail to disclose a fact to a tribunal when disclosure is necessary to avoid assisting a criminal or fraudulent act;

Tex. Disc. R. Prof. Cond. 3.03 ("Candor Towards the Tribunal"). This rule "encompasses false statements by a lawyer that *might* corrupt the course of litigation." *Diaz v. Comm'n for Lawyer Discipline*, 953 S.W.2d 435, 438 (Tex. App.—Austin 1997, no pet.). "Further, withdrawal of a false statement of material fact or misrepresentation does not extinguish the initial misconduct." *Willie v. Comm'n for Lawyer Discipline*, No. 14-13-00872-CV, 2015 WL 1245965 (Tex. App.—Houston [14th Dist.] Mar. 17, 2015, pet. denied) (not designated for publication).

suicide in 1990. In a handwritten suicide note, he continued to proclaim his innocence in what he intended to be his last words.

> Aug. 20, 1990
>
> I REALLY WAS
> AN INNOCENT MAN.
> Goodbye MAMA, DADDY,
> AUNT JOANNE.
> I'm sorry I could
> Not Fight it ANY
> more.
> TAKE me Home, KERRY MAX COOK
> Lord.[292]

He proclaimed his innocence again upon waking up in the infirmary after the prison medical team saved his life.[293]

And nothing in the record shows that the State—completely aware of the deception because they initiated it—took any steps to halt Cook's then-pending execution. Sgt. Collard's knowing misrepresentations of the age of the fingerprints are also representative of sending a defendant to death row after hiding the ball. Even after he was caught in his deception, the State continued to urge Sgt. Collard to testify as an expert that the fingerprints were "fresh" and "recently made" in the second and third trials—18 years later—even though this position was completely scientifically unsupported.

By the end of the third trial, where a potential death sentence had been hanging over Cook's head for nearly two decades, this Court discovered *even more* misconduct in the

---

[292] (III Tr. St. Exh. 231).

[293] (III Tr. St. Exh. 234).

form of numerous *Brady* violations including withheld exculpatory evidence and undisclosed grand jury testimony. Among them were Hoehn's statements that (1) refuted his later trial testimony of having sexual relations with Cook, and (2) undermined the impression that Cook paid any attention to a movie depicting the mutilation of a cat—both positions that the State materially relied on to fit Cook to their killer's profile. It was also revealed that the State had failed to disclose crucial evidence in its possession showing that Cook and Linda knew each other and had an encounter at Linda's apartment earlier in the week.

Following Cook's fourth prosecution more than 20 years later, we now have the final bookend of deception. We now learn that the State's profile of the killer was flawed from its inception and that Mayfield was dishonest on numerous material points. Where the prosecuting party relies on numerous misrepresentations to contrive a conviction, the more it weighs heavily in favor of the defendant's actual innocence. This is because while a single instance might be attributable to mere negligence or honest mistake, no rational juror can trust a prosecuting party proven to have engaged in repeated deception, especially where that party possesses the greater resources of the state.

Putting all the evidence together, the State fails to show anything more than Cook just being in the wrong place at the wrong time to his extreme misfortune. Though his fingerprint was at the apartment (but not in the bedroom), it is explainable via the testimony of multiple witnesses and the withheld grand jury testimony that also undermines the State's theory of Cook's murderous profile and thereby his alleged motive. The impossible

102

timeline provided by the State corroborates Cook's explanation far more than the State's. Furthermore, the lengths the State resorted to in their attempts to misrepresent the time-aspects of the fingerprint says something in itself about its exculpatory strength.

The same could be said about the State's attempts to force-fit the profile to Cook. At best, the criminal profile/classification evidence provided by the State by itself is self-contradicting. It either shows Cook was a homosexual/bisexual, in which case he would have targeted males, or it shows that he was an individual acting within the normal ranges of human behavior—though not always admirably. The new discovery of Mayfield's semen at the scene of the crime over 20 later and his lies almost 40 years later about not having any sexual contact with Linda Jo Edwards for three weeks prior to the murder reveals the flawed nature of the police investigation. It shows how the police became fixated on Cook early on without entertaining any healthy levels of doubt and at the expense of even investigating obvious possibilities such as Mayfield. The addition of Mayfield's knowledge of the book, *The Sexual Criminal*, as additional new evidence exculpates Cook and directs *substantially more* suspicion at Mayfield.

In *Ex parte Miles*, this Court held, as it does today, that the applicant was entitled to have his conviction set aside—in *Miles*, it was pursuant to *Brady*; in this case, it is due to the false testimony of James Mayfield. In *Miles*, when we factored in the *Brady* evidence

103

with other newly discovered evidence, it was "apparent that Applicant [was] entitled to relief on actual innocence grounds:"[294]

> The newly discovered evidence is of heightened importance when viewed in the context of the entire record. It is particularly clear that this new evidence would have weighed in favor of an acquittal of Applicant when it is balanced against all of the evidence presented at trial and the facts uncovered through post-trial investigation.[295]

We apply the same analysis to this case because "[E]ach piece of the State's evidence is questionable 'or has since been undermined or completely invalidated.'"[296] As this Court already noted upon reviewing Cook's second direct appeal,

> Prosecutorial and police misconduct has tainted this entire matter from the outset. Little confidence can be placed in the outcome of appellant's first two trials as a result, and the taint, it seems clear, persisted until the revelation of the State's misconduct in 1992.[297]

Thus, just as this Court unanimously held in *Ex parte Miles*, we hold in this case that "the multiple pieces of newly discovered evidence presented here," which includes the

---

[294] *Miles*, 359 S.W.3d at 664.

[295] *Id*. at 672–73.

[296] *Ex parte Chaney*, 563 S.W.3d at 278 (quoting *Miles*, 359 S.W.3d at 673). In many ways, the State's evidence here is weaker than in *Ex parte Chaney* where we found Chaney actually innocent. In *Chaney*, the only evidence against him was a partial thumbprint that proved "Chaney was in the apartment at some point," and bloody shoe prints that could not be connected to Chaney. *Ex parte Chaney*, 563 S.W.3d at 277. Here, we only have Cook's fingerprints that show he was there *at some point* and multiple pieces of evidence showing that it innocently happened multiple days prior.

[297] *Cook v. State*, 940 S.W.2d at 627.

DNA evidence, along with the evidence of false testimony and State misconduct, "amount to affirmative evidence that unquestionably establishes [Cook's] innocence."[298] And, just as this Court held in *Ex parte Miles*, we also hold in this case that when the newly available and other exculpatory evidence—which includes the evidence of false testimony and prosecutorial misconduct—is balanced against the evidence of guilt, all of this evidence clearly and convincingly shows that "no rational jury would convict [Cook] in light of the new evidence."[299] As we held in *Ex parte Mayhugh*, the evidence presented by Cook "has eroded the persuasiveness of the State's already weak case."[300] In prosecuting cases, the State is not required to prove the defendant guilty beyond all doubt or beyond a shadow of a doubt. The State merely has to prove guilt beyond a *reasonable* doubt—which the State could never achieve in this case. Cook should therefore not have to prove his innocence beyond *all* doubt. He merely has to show that, when the new evidence is compared to the State's case for guilt, "no jury could *rationally* find [him] guilty."[301] And because we grant relief on actual innocence grounds, we need not address Cook's Due Process claims.

For almost half a century Cook has proclaimed his innocence. Cook has been the victim of numerous Brady violations, secret deals, prosecutorial blunders, and perjured

---

[298] *Miles*, 359 S.W.3d at 671; *see also Ex parte Henderson*, 384 S.W.3d 833, 860 (Tex. Crim. App. 2012) (Hervey, J., dissenting) (noting that, "in this Court's unanimous opinion in *Ex parte Miles*, . . . we looked to all of the evidence presented and only then determined that actual-innocence relief was warranted").

[299] *Miles*, 359 S.W.3d at 673.

[300] *Mayhugh*, 512 S.W.3d at 299.

[301] *Id*. at 307 (emphasis added).

testimony. And finally, there is newly discovered evidence following Cook's no contest plea which prominently includes Mayfield's DNA found in the panties Linda Jo Edwards was wearing the night of her murder and his admission of perjury in two separate jury trials to eliminate himself as a suspect and convict Cook. After being incarcerated on death row for almost twenty torturous years, we hold that Cook has met the burden required for actual innocence and relief is hereby granted.

Delivered: June 19, 2024

Publish